# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**FILED**
**UNITED STATES DISTRICT COURT**
**DENVER, COLORADO**
*4:49 pm, Apr 01, 2026*
**JEFFREY P. COLWELL, CLERK**

Civil Action No.    25-cv-03519-CNS-TPO

Riley Doe, Plaintiff

v.

Steamboat Springs RE-2 School District,

Thomas Valand,

Daniel Bloom, Defendant(s).

## SECOND AMENDED COMPLAINT

---

### NOTICE

Federal Rule of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should not contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include only: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

**Plaintiff need not send exhibits, affidavits, grievances, witness statements, or any other materials to the Clerk's Office with this complaint.**

---

**A.      PLAINTIFF INFORMATION**

*Riley Doe*
*rileydoevsssd@gmail.com*

*Plaintiff proceeding under pseudonym*
*Contact and address information filed under seal pursuant to D.C.COLO.LCivR 7.2*

**B.      DEFENDANT(S) INFORMATION**

Defendant 1:     Steamboat Springs RE-2 School District
325 7th Street
Steamboat Springs, CO, 80487

970-871-3199

Defendant 2:     Thomas Valand
c/o Steamboat Springs High School
45 E Maple Street
Steamboat Springs, CO 80487

tvaland@ssk12.org

Defendant 3:     Daniel Bloom
c/o Boulder High School
1604 Arapahoe Ave
Boulder, CO 80302

720-561-2232
daniel.bloom@bvsd.org

2

## C.    JURISDICTION

Federal question pursuant to 28 U.S.C. § 1331 (claims arising under the Constitution, laws, or treaties of the United States)

> 42 U.S.C. § 1983
> 20 U.S.C. § 1681 (Title IX)
> Americans with Disabilities Act
> Section 504 of the Rehabilitation Act

This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as they are so related to the federal claims that they form part of the same case or controversy.

Diversity of citizenship pursuant to 28 U.S.C. § 1332 (a matter between individual or corporate citizens of different states and the amount in controversy exceeds $75,000)

Plaintiff is a citizen of the State of California

Steamboat Springs RE-2 School District is a Colorado Local Government entity (54901)

Thomas Valand is a citizen of Colorado

Daniel Bloom is a citizen of Colorado

3

### D.     INTRODUCTION

This case concerns a systemic failure at Steamboat Springs High School (SSHS) to provide one of the most fundamental requirements of a public education: a safe, non-discriminatory educational environment.

Plaintiff was a student at SSHS who wanted nothing more than to be able to participate in class, be free of targeted harassment, and make friends. Instead, they were subjected to a sustained and targeted campaign of harassment and humiliation from specific peers intended to remove them as a participant in class, targeting nothing more than their mere existence as an equal participant in the space.

Plaintiff did precisely what students are told to do when they are being bullied – talk to an adult. Several adults, in fact. Plaintiff consistently brought the students' actions to the attention of Defendants and other adults, in routine attempts to understand why they were being targeted for removal, resolve any disability-related concerns, and ensure they were able to participate with their peers in class. Defendants understood the students actions were intended to remove Plaintiff from classroom participation, that they were causing Plaintiff severe distress, that they were impairing their ability to think and participate, and that Plaintiff believed the students were targeting their sex and gender.

Rather than inform Plaintiff that the students' behavior was unacceptable and protect Plaintiff's ability to participate with their peers in class, Defendants asserted the students had a "right" to remove Plaintiff from the classroom environment, and that Plaintiff's insistence on participating was potentially criminal conduct (stalking) and the police could get involved. As justification, Defendants cited the fact that Plaintiff was a "larger male," and the other students

were "females," among other concerns that Plaintiff was "missing the social cue" to leave.

This was not a momentary lapse or oversight – this was an institutional choice. The individual Defendants coordinated to adopt the abusive response, communicated it to Plaintiff's parents, and consistently reiterated the same response, not only throughout the many months Plaintiff sought guidance, but even years later when Plaintiff reached out to Defendant Valand to understand what had happened.

As a result of Defendants' discriminatory and abusive actions, Plaintiff's distress worsened, and they felt immense amounts of guilt and shame for wishing to participate in class with their peers. Plaintiff isolated themselves in and out of class. The peer bullying and harassment deteriorated, but Defendants' doubled down on their discriminatory narrative, further preventing Plaintiff from addressing the abuse and reinforcing Plaintiff's guilt and shame for even showing up to class or wanting to participate with their peers in class. Plaintiff has experienced years of intense distress, confusion, shame, guilt, and flashbacks and has been unable to participate in education or engage with their peers. Plaintiff has been diagnosed with PTSD, and continues to suffer symptoms on a daily basis.

Plaintiff now turns to the courts to hold Defendants' accountable for the grave harm caused by their violation of Plaintiff's rights.

### E.    FACTUAL ALLEGATIONS

**a. There was a pervasive attitude at Steamboat Springs High School (SSHS) that it was acceptable to exclude, segregate, and disregard Plaintiff during school activities on the basis of gender.**

1.    Towards the end of the 2021-22 school year, at Steamboat Springs High School

5

(SSHS), Plaintiff was informed by the head of the LGBTQ+ club at the time, regarding Student A and their friends, that Plaintiff would not be able to engage with them in the lunchroom because "they're all girls and [Plaintiff] is a boy," or something along those lines. When Plaintiff pushed back, the student head of the LGBTQ+ club doubled down, saying something along the lines of "that's just the way it is." As a result, Plaintiff believed such discrimination was acceptable due to their perceived gender.

2.      During a speech and debate bus ride in the 2021-22 school year, Plaintiff was told they were "hovering" and behaving in a "creepy" manner by a student as they attempted to participate in group conversations (all participants presented female, participants included Student A) happening during the bus ride. In reality, Plaintiff was interested in participating but scared to speak. This demonstrates a cultural attitude that Plaintiff did not belong due to their gender, and that other students' discomfort was more meaningful and valid than Plaintiff's right to participate and fully enjoy the benefits of the educational institution.

3.      In the 2022-23 school year, Plaintiff had many classes with Student Y. Student Y was friends with Student A.

4.      In many of their classes with Student Y, Plaintiff did not interact with Student Y and instead interacted with other students. However, in every class where Plaintiff did attempt to participate in conversations with Student Y, Student Y made it clear Plaintiff was not allowed to participate with them and the other students they engaged with. Student Y would routinely tell Plaintiff to "stop listening" before they even sat down in class. Most of the other students went along with Plaintiff's removal from class participation. Plaintiff did not seriously push back, as they did not understand what was happening was not acceptable.

6

5.      In one incident, Student Y spread false and gendered allegations ("[Plaintiff] was following [a female student] in the hallways") and communicated them to others behind Plaintiff's back in an apparent attempt to further socially isolate and emotionally harm Plaintiff. Plaintiff informed admin (cannot recall specific staff name) of Student Y's conduct. No action was taken.

6.      This discriminatory culture enabled Student Y and other students to deliberately and systematically remove Plaintiff from participation with other students in class and in extracurricular activities (such as speech and debate) with little to no social or institutional consequences. They made it clear to Plaintiff they did not belong and were not allowed to participate in class conversations, sending the message that Plaintiff's existence and participation in the space was objectionable.

7.      A member of the queer community Plaintiff had talked with, has stated that they would not be welcome at the majority of the lunch tables because they were queer.

8.      In a class in the 2021-22 school year, Student A, a sophomore at the time, remarked to the class something along the lines of "I should find a junior to take me to Prom." No one reacted. Plaintiff, wishing to express a similar sentiment, said something along the lines of "I should also find someone to take me to prom." Student A and a different student nearly instantly attacked Plaintiff's statement, asserting that Plaintiff shouldn't go to prom, and when Student A was pushed on why, they said "because [the other student] said so." This demonstrates that the hostility was arbitrary and targeted, rather than based on any breach of social conduct by the Plaintiff.

9.      Towards the end of the 2021-22 school year, Student B (a junior), invited a

mutual female friend (not Student A; a sophomore) to Prom. They declined. Only Juniors and Seniors are able to attend prom, however, they can invite a Sophomore if they wish. Plaintiff, also a sophomore, asked instead if they could come. Student B responded with something along the lines of "I am going with other juniors." This strongly implies Student B felt uncomfortable inviting Plaintiff due to the potential responses from the other juniors. While Plaintiff lacks knowledge of the precise cause, Plaintiff believes given the circumstances Plaintiff's gender and respective gender roles played a role.

10. During a break in a district-hosted college prep workshop, Plaintiff attempted to engage in dialogue with a group of workshop participants, including Student B. Despite the Plaintiff's status as a peer and student, the group (all presenting as female) refused to acknowledge or engage with Plaintiff, and treated their attempts at conversation as an intrusion. The group's immediate and coordinated refusal to acknowledge the Plaintiff, despite having no prior interaction with them, indicates that the exclusion was based on visible protected characteristics. This unauthorized social blockade created a stigmatizing and hostile environment, causing the Plaintiff to feel humiliated for attempting to participate in the shared environment.

11. These incidents served as the foundation for the discriminatory environment that the Defendants later ratified and enforced through framing Plaintiff's participation as criminal conduct and "warning" of police involvement.

**b. Defendant Valand is a Licensed Social Worker (LSW) and Steamboat Springs High School's (SSHS) designated mental health professional and social worker.**

12. Defendant Valand is a Licensed Social Worker (LSW.0009925333) with a

8

Masters in Social Work (MSW/Clinical / School Social Work) from Colorado State University.

He graduated with a 3.8 GPA, Magna Cum Laude. See https://linkedin.com/in/thomas-valand-lsw-4588395

13.    Defendant Valand was SSHS's designated mental health professional and social worker at all relevant times herein. See https://steamboatschools.net/departments/mental-health

**c. Defendant Bloom was Plaintiff's assigned school counselor.**

14.    Defendant Bloom was a school counselor at all relevant times herein.

15.    Defendant Bloom was the institution's assigned counselor to Plaintiff.

**d. SSHS's AP French class is a collaborative class, designed for independent and collaborative work.**

16.    SSHS's AP French class is not a standard lecture hall with many seats facing towards a speaker.

17.    SSHS's AP French class contains several circular tables, each comfortably seating several students.

18.    A major part of AP French class did not consist of lectures, rather, of independent or collaborative work time. The AP French teacher would routinely instruct students to work on tasks on their own during work time.

**e. Students A and B did not routinely engage in class in the 2021-22 school year. Plaintiff would engage with Student B. Whenever Plaintiff attempted to engage in conversations involving Student A, Student A would take action to remove Plaintiff and prevent Plaintiff from participating in the space.**

19.    In class, Student A would talk mainly with a friend (Student X)

9

20.    Plaintiff and Student B would talk mainly with each other.

21.    Plaintiff, Student A, Student B, and Student X all shared a table.

22.    Plaintiff does not recall Student A whispering with Student X or leaving to work or talk outside without inviting others.

23.    The occasional times when Student B was not present and Plaintiff attempted to participate with Student A and Student X, Student A disregarded and refused to allow Plaintiff to participate and would shut Plaintiff down with phrases such as "you should do your work" while continuing to engage, collaborate, and socialize in front of Plaintiff.

24.    The occasional times when Student X was not present, Student A would talk with Student B. Likewise, Student A would disregard Plaintiff and refuse to acknowledge or allow Plaintiff to participate.

25.    At the end of the school year, the class went on a school-sponsored trip to a restaurant. Student A invited Student X and Student B to go in their car, while Plaintiff had to ask to come along, despite sharing a table with Student A, B, and X. This shows while Student B may not have been close or interested in participating, they were seen as a valid peer.

26.    At the end of the school year, Student X changed classes, leaving Student A, B, and Plaintiff in the class.

**f. Plaintiff was subjected to a campaign of systematic and targeted humiliation, exclusion, and bullying calculated to remove Plaintiff from participation in French class in the 2022-23 school year. The individual defendants ("Defendants") were consistently informed and aware of the students' actions and understood the students' actions were based on sex, intended to remove Plaintiff from the class environment, and causing Plaintiff serious**

10

**distress.**

**f.1. On a routine basis, Plaintiff would be bullied in class, and then communicate the situation as accurately and clearly as possible to Defendants' and other adults, seeking understanding as to what was happening and support regarding how to cope with their distress and address their potential social deficiency (missed "social cues") so the students would allow Plaintiff to participate in class.**

27. At some point at or around January 2023, Plaintiff began working with Defendant Valand at Steamboat Springs High School (SSHS).

28. Over the span of a few months, Plaintiff consulted with Defendant Valand and Bloom many times, confused and in emotional distress, attempting to understand what was going on in the classroom, and why Plaintiff was being pushed out of the class environment, isolated from a friend, and systematically humiliated when they attempted to participate.

29. On a routine basis, Plaintiff would be bullied in class, and then communicate the situation as accurately and clearly as possible to Defendants' and other adults in attempts to understand what was happening.

30. Plaintiff sought explanations and assistance from Defendant Valand regarding their distress and potential social deficiency (struggle to get "social cues"). Plaintiff sought advice on what they were supposedly doing wrong so the other students would allow them to participate in the class environment

31. In addition, Plaintiff informed Defendants of the immense harm the situation was causing Plaintiff. See section f.8 for details about awareness of harm.

**f.2. Student A engaged a year-long, systematic, and deliberate campaign of erasure,**

11

**isolation, and humiliation to remove and segregate Plaintiff from participation in all conversations they took part in during independent and collaborative work time, including personal, collaborative, and academic conversations. Defendants were aware of the constant, systematic, and targeted nature of the behavior and believed the students actions were intended to remove Plaintiff from the shared classroom environment. Defendants' actively supported the students' removal of Plaintiff, took steps to enforce it, and asserted Plaintiff's insistence on participating was sexually predatory ("stalking behavior") and criminal (asserting law enforcement could get involved), on the basis of sex and disability.**

32.     Student A intentionally and systematically shunned, refused acknowledgment, and treated Plaintiff as invisible, with no communication, reason, respect, or human dignity, while constantly conversing with Student B in front of Plaintiff during class time, despite Plaintiff's consistent attempts to participate. Student A and Student B consistently talked warmly, smiled, shared, whispered, and engaged happily with each other while Plaintiff was systematically disregarded or shut down by Student A upon attempting to participate in all conversations. This involved every conversation Student A took part in during class time, including everything from the currently assigned task, college options, and other academic conversations to talk regarding social events and student gossip. Plaintiff was forced to watch as they were removed from the class environment every day in all but the most literal sense.

33.     On the rare occasions when Plaintiff refused to accept Student A's deliberate disregard of Plaintiff and kept attempting to participate, Student A would shut Plaintiff down with statements such as "you should do your work" while continuing to engage, collaborate, and socialize amicably with Student B and others in front of Plaintiff, isolating and humiliating

Plaintiff.

34.    Student A's behavior was inherently humiliating. Plaintiff was forced to watch as they were removed from the class environment every day, in all but the most literal sense.  The message was clear. "You don't count as a participant here, you're not a part of this, you aren't allowed to be, and your attempts to participate are a nuisance to be dismissed." The message led to Plaintiff feeling ashamed and problematic for showing up and wanting to participate in class, while being forced to witness their own removal. These statements and attitudes functioned to prevent Plaintiff from engaging in class, humiliating Plaintiff and enforcing a hierarchy where they weren't allowed to participate in the classroom.

35.    Plaintiff informed Defendants of Student A's systematic, deliberate, and humiliating attempts to disregard and remove Plaintiff while constantly engaging with other peers in front of Plaintiff, along with Plaintiff's resulting feelings of being problematic for showing up.

36.    Plaintiff shared their belief that they were being removed simply because it made the bullies "feel good," stating it's a "free card."

37.    Plaintiff shared with Defendants that Student A's behavior "feels intentional" and "feels terrible."

38.    Plaintiff shared with Defendant Valand that Plaintiff's anxiety/distress stemmed from Plaintiff's feeling that students did not want them "there," (in the classroom) and that they were "telling [Plaintiff] to leave."

39.    Plaintiff shared with Defendant Valand that the behavior was making it impossible for Plaintiff to participate, and causing intense amounts of anxiety and distress.

13

40.     Defendants understood Student A's behavior to be purposeful attempts to remove Plaintiff from the class environment. See e.g. ¶44. (Plaintiff mistakenly believed actions were neutral social choices; Defendants claimed intent to remove from environment and supported Plaintiff's removal)

41.     Defendants actively supported the students' removal of Plaintiff and framed Plaintiff as sexually predatory and criminal for insisting on exercising their lawful right to participate anyways, on the basis of their sex and disability. See section E.g (action taken by Defendants), E.h (on the basis of sex/disability).

**f.3. Student A would often coordinate with Student B to remove and segregate Plaintiff from participation in the classroom environment. Plaintiff informed Defendants of these incidents, and Defendants concluded the student's actions were intended to prevent Plaintiff from engaging as a participant in the space. Defendants responded by framing Plaintiff's wish to participate as problematic, sexually predatory, and criminal stalking behavior for missing the "social cue" to leave, on the basis of sex and disability.**

42.     Student A would often whisper with Student B in class during independent and group work time. In many cases, immediately after these whispers, Students A and B would leave to work outside or socialize together in the halls, disregarding and isolating Plaintiff. Plaintiff informed Defendants of these incidents. Plaintiff bent over backwards to think, "oh, maybe they didn't realize [Plaintiff] wanted to participate, oh, maybe it is a neutral choice." But that couldn't have been true. Student A must have known Plaintiff was interested in participating due to Plaintiff's repeated, good-faith attempts to participate and show interest. Plaintiff does not recall Student A behaving this way the prior year while Plaintiff was not attempting to

14

participate.

43.    Due to Student A's behavior in class, the most logical conclusion is whispering in front of Plaintiff and subsequently leaving to work outside or socialize in the halls together during group and independent work time was a deliberate choice to segregate, humiliate, degrade, and erase Plaintiff while strengthening their bond and pressuring Student B to go along with the bullying. When one looks at the totality of the circumstances, it becomes clear this was an attempt to deny Plaintiff equal standing and access to class participation.

44.    Plaintiff informed and Defendants understood the students would often whisper and then leave together outside. Defendants understood these were deliberate attempts to remove and segregate Plaintiff from participation in the environment. Indeed, Plaintiff shared to Defendants their mistaken belief that the student's coordinated attempts to leave were simple neutral oversights, rather than coordinated attacks to remove Plaintiff. Defendants, however, concluded that the behavior was deliberate and calculated to remove Plaintiff from the class environment, stating Plaintiff was missing the "social cue" to remove themselves. Defendants proceeded to actively support the removal of Plaintiff and framed Plaintiff's insistence on participation as sexually predatory and criminal stalking behavior for not accepting their removal on the basis of sex/disability. See section E.g (action taken by Defendants), E.h (on the basis of sex/disability).

**f.4. Plaintiff believed and informed Defendants the students were acting on the basis of sex. Plaintiff had been attempting to appease and accommodate the other students to resolve any concerns. Defendants understood their intentions and efforts. The systematic and targeted denial of access persisted. Plaintiff engaged in a protected activity by complaining**

**of student discrimination and advocating against their removal from class participation on the basis of sex. Yet, Defendants supported the students' removal of Plaintiff, warning Plaintiff of serious, even criminal, consequences for continuing to insist on participating.**

45.    Plaintiff didn't want any issues. Plaintiff wanted to be treated with respect as a valid participant in class, and didn't want conflict with anyone. Initially, Plaintiff bent over backwards to assume good faith on Student A's end, and respected Student A's initiative. Plaintiff told themselves that, "Oh, maybe [Student A] is uncomfortable. Maybe I'm not girly enough. I should keep working hard to accommodate them and be positive and kind, and things will get better." Over time, Plaintiff consistently made many attempts, in good faith, to conform to traditional feminine stereotypes (be more "girly"), accommodate, and engage with and participate in the conversations happening in front of them, in class during class time, with the mutual friend.

46.    Despite this, Student A continued systematically going out of their way to prevent Plaintiff from participating before they had a chance to do so, while openly performing closeness, kindness, and inclusivity with Student B in front of Plaintiff. Plaintiff later came to understand that Student A's conduct could not reasonably be explained as good-faith discomfort or ordinary closeness or preference. Rather, the deliberate, systematic, and all-encompassing exclusion was calculated to segregate and remove Plaintiff and strengthen their bond with Student B, taking advantage of Plaintiff's confusion and willingness to accommodate to isolate Plaintiff and create a class environment in which Plaintiff did not receive basic acknowledgment or participation despite their consistent attempts to participate, and was removed from the room in all but the most literal sense.

47.     Plaintiff wrote a letter to Student A, attempting to address the harmful behavior in question. The letter explained Plaintiff's experience to Student A, how it was harmful, Plaintiff's resulting feelings, and Plaintiff's wish to participate. Student A responded with something along the lines of "you should talk to your therapist" demonstrating a conscious choice not to address the harmful behavior they were perpetrating or Plaintiff's legitimate interest of participation in class. Plaintiff shared both the letter and the students' response with Defendant Valand and potentially Defendant Bloom.

48.     Plaintiff was doing nothing more or less than any other student – showing up to class and attempting to participate with their peers. Because of Plaintiff's constant and extensive efforts to accommodate and respect the students' choices and needs, the students' targeted conduct did not target any specific behavior or actions, rather, Plaintiff's mere existence as an equal participant in class. On information and belief, the students' attempts to remove Plaintiff from participation were based on Plaintiff's gender. See e.g. section E.a, ¶167, ¶61.

49.     Having engaged in a daily campaign of systematic humiliation, isolation, and degradation against Plaintiff, any resulting discomfort was a product of the students' own discriminatory harassment, not any objective threat posed by the Plaintiff's presence in the classroom. Indeed, Student B only began avoiding Plaintiff immediately after they had objected to the hostile environment in class. See ¶61.

50.      Student A's message was clear: "We matter and belong, you don't. We are allowed to participate here, you aren't." Plaintiff was not allowed to participate in the space, and wasn't even worthy of basic consideration or acknowledgment. This is bullying and denial of access in its most basic form. Defendants were aware of the Students' conduct and it's intent to

17

remove Plaintiff and prevent Plaintiff from participating. See e.g. E.f.2.

51.　Plaintiff informed Defendants of their efforts and conciliatory intent to accommodate the other students, and sought advice on what they were missing ("social cues") so they would be allowed to participate. Defendants recognized Plaintiff did not wish to cause any issues, and merely wanted to participate in class and make friends, and was not romantically interested.

52.　Plaintiff informed Defendants they felt they were being removed because the other students wanted "girl time" (see ¶48 for factual basis of Plaintiff's belief), and that they wanted to be treated as if they were a girl. Plaintiff's objection to their removal on the basis of sex was a protected activity, advocating against sex discrimination for equal access to the class environment.

53.　Despite this, Defendants actively supported the students' removal of Plaintiff from the class environment and framed Plaintiff's insistence on participating as criminal stalking behavior on the basis of sex/disability. See sections g (action taken by Defendants), h (on the basis of sex/disability).

**f.5. Plaintiff's notes contain a very limited subset of the incidents, all of which were communicated to Defendants. Even as Plaintiff was bending over backwards to believe the students' actions were neutral, Defendants ultimately understood these as intentional attempts to remove Plaintiff from the classroom environment.**

54.　These incidents are specific, documented incidents which were shared with Defendants in person and in notes during Plaintiff's counseling. These are a very limited, documented subset of the year-long, all-encompassing, and systematic harassment and intended

to expel Plaintiff from the classroom environment. While any individual incident here could be chalked up to an isolated choice not to share a particular subject, the daily, systematic, deliberate, targeted, and all-encompassing nature communicates intent to remove Plaintiff, not from any particular conversation or subject, but the rather from participation in the class environment itself. Unfortunately, Plaintiff did not document the day-to-day actions taken by the other students. However, they were communicated to Defendants, and Defendants ultimately understood these acts as intentional attempts to remove Plaintiff from the environment. See e.g. ¶44. (Plaintiff mistakenly believed actions were neutral social choices; Defendants asserted students' intent to remove and supported and enforced Plaintiff's removal)

55.    In one situation, communicated with Defendants, the class was filling out surveys about teachers. Plaintiff attempted to ask their peers at their table about their experiences with the relevant teachers. Student A responded with "you should fill it out on your own." A few minutes later, Student A begins talking to Student B about the form and their experiences with teachers. Plaintiff left the class to cry outside in the halls, and noted they were "starting to cry writing this." Plaintiff remembers sharing this incident as noted in person with Defendants as a part of going through their notes, and has a good faith belief they told Defendants about the effect it was having on them and their crying. Defendants ultimately understood these as intentional attempts to remove Plaintiff from the environment. See e.g. ¶44.

56.    In another situation, Student A got her reply from her French pen pal, as assigned by the teacher. The students were instructed to read responses from their pen pals. Student A read the letter with Student B, and remarked how she was going to "stalk her on Instagram" in an excited tone. Student A got closer with Student B and begins sharing it with them. Plaintiff,

19

wishing to see and participate, attempts to move their chair closer to see. Student A moves their computer towards Student B and away from Plaintiff in response to Plaintiff attempting to see, in an apparent attempt to make it clear Plaintiff was not allowed to engage. Plaintiff went through this incident in person with Defendants, sharing how they believed Student A was being "utterly careless," and unsure whether it was intentional. Defendants ultimately understood these as intentional attempts to remove as a participant Plaintiff from the environment. See e.g. ¶44.

57.     Student B asks student A about their schedule. Plaintiff, understanding that a plan is being made, expresses interest in knowing what was happening to figure out if they would be interested in participating. Student B responds with "oh, it's nothing." Plaintiff also noted that "half the things she said to [Student B] and [Plaintiff] asks about are 'nothing.'" The substance of this was communicated with Defendants. This represents the broader attitude that Plaintiff did not count as a viable participant in the shared space, for both in-class and out of class activities. If the other students were acting in good faith, they would be able to tell Plaintiff both what they were doing and why Plaintiff could not be invited. Defendants ultimately understood these as intentional attempts to remove Plaintiff from the environment. See e.g. ¶44.

58.     In another case, shortly prior to class starting, Student B left to go get something. Student A ran after them shortly after, with no engagement or explanation to Plaintiff. Plaintiff sat alone in silence for several minutes, and eventually decides to go out in the hall, and sees the two students walking together, talking. Plaintiff's notes say "presumably having a private conversation," however, it is also plausible if not more likely than not given the history of systematic and all-encompassing deliberate exclusion that the conversation was not truly private, and that leaving was merely a choice to reinforce Plaintiff's status a non-participant. Defendants

20

were informed about this event, and ultimately concluded that these events were not neutral or a "private conversation," but rather conduct calculated to remove Plaintiff as a participant and signal they did not belong. See e.g. ¶44.

**f.6. Student B did not show discomfort towards Plaintiff prior to Plaintiff's objection to their treatment in class. Student B behaved in a friendly manner and would routinely invite Plaintiff into their car to drive home with them. Student B gradually sided with the exclusion and humiliation, and retaliated against Plaintiff when they attempted to speak up, leveraging gender stereotypes to assign malicious intent to Plaintiff.**

59.    Plaintiff and Student B lived close to each other. Student B would routinely invite Plaintiff into their car to drive home together. When Plaintiff walked home, and Student B would pass them in their car, Student B would wave at Plaintiff, and Plaintiff would wave back. This friendly behavior continued through the end of 2022, and only ceased shortly after Plaintiff talked to Student B objecting to the routine, humiliating, and targeted abuse in class, perpetrated by Student A. Any discomfort on Student B's end was not caused by Plaintiff's purportedly inappropriate behavior or a wish to "not be friends," but rather pressure from and discomfort towards the hostile classroom environment. Plaintiff shared these details with Defendants, however, Defendants either did not listen to or did not believe Plaintiff. Instead, Defendant Valand told Plaintiff Student B was "not [their] friend" or something very similar, and framed their insistence on being allowed to participate in classroom conversations alongside Student B as an unwanted "relationship" and criminal stalking behavior (see g), on the basis of sex/disability (see h).

60.    In one instance, after many months of the systematic and ceaseless bullying in

class, Student A mentioned to Student B something along the lines of how "[They] found someone to go to the Taylor Swift concert with." Student B lamented they were not able to come with due to some logistical constraint. Plaintiff, also a fan of Taylor Swift and wanting to show interest in participating, suggested that they could come with. While Student A's response was simply "no," Student B joined in to reinforce the bullying dynamic, telling Plaintiff "don't ask to be invited." While there can be many legitimate reasons to refuse an invitation, telling someone they can't even ask goes far beyond any legitimate interest. It functions to degrade and shame the speaker for advocating for themselves, and reinforce and legitimize the bully's control over who does and does not belong or count. Student B aligning with Student A's bullying highlights the abusive and coercive nature of the environment and Student A's behavior, going far beyond any legitimate conflict or dispute. Student B likely sided with Student A's abuse since Student A went out of their way to make Student B feel valued and safe, while shunning Plaintiff and framing Plaintiff as a problem for wanting to participate in class. Going along with this dynamic likely functioned to reinforce Student B's sense of safety and belonging, at the expense of Plaintiff's personhood and ability to participate in class and access education. On information and belief, Plaintiff communicated the substance of this incident to Defendants

61.     At some point towards the end of December 2022, Plaintiff raised concerns with Student B about the ongoing removal from class. After raising concerns, Student B began avoiding Plaintiff. Upon further inquiry by Plaintiff, Student B accused Plaintiff of trying to separate them and Student A. Student B maintained their relationship with Student A. Given Student A's social dominance and the established pattern of targeted exclusion and isolation toward Plaintiff, it is reasonable to infer that the removal, bullying, and humiliation Student B

22

witnessed every day in class had caused them to internalize the message that the intimate nature and safety of their bond depended on putting Plaintiff down and preventing Plaintiff from participating as a peer in class. As a result, Student B effectively sided with the bullying and harassment and punished Plaintiff for speaking up. This further caused Plaintiff to feel problematic and ashamed for wanting to participate in class. This supports the intimidating, coercive, and oppressive nature of the environment, making it unsafe for Plaintiff to address the situation, and further reinforcing the message that Plaintiff's basic dignity didn't matter and that Plaintiff was problematic for wanting to participate. Additionally, the otherwise unfounded accusation of trying to separate them was based in gender stereotypes ("the boy is trying to separate the girls") and bullying dynamics: Student A was actively and deliberately separating and isolating Plaintiff, but because Student B was benefiting from the situation and confronting it felt risky, blame was shifted onto Plaintiff, the easy and accommodating target, instead. On information and belief, Plaintiff communicated the substance of this incident to Defendants.

**f.7. Defendants were aware the students were leveraging their so-called "friendship" to prevent Plaintiff from participating in class, and supported their removal of Plaintiff on the basis of sex and disability using "friendship choices" as a pretext.**

62.    At the end of the year, Plaintiff questioned Student A on why they were excluded in class. Student A responded something along the lines of, "[Student B] is one of my closest friends and I did not feel comfortable including you." While this could make sense for sensitive or personal topics, such as, for example, a family tragedy, that couldn't be further from this situation. It was every day, every thing, in class, during independent and collaborative work time, in front of Plaintiff, as Plaintiff actively and consistently attempted to participate. There is

23

no legitimate "privacy" argument. Additionally, Student A and B did not appear close prior to the school year. Student A's statement, when considered in context, confirms Student A's bullying was intended to enforce a social hierarchy, weaponizing targeted attention, affection, and care to elevate and intensify their bond with Student B while enforcing a reality where Plaintiff was isolated, segregated, and unable to participate in the classroom environment.

63.     Given the deliberate, systematic, and public nature of the exclusion, the apparent lack of prior close friendship, Student B's gradual support of Student A's conduct, Student B's unfounded allegation that Plaintiff was trying to separate them by expressing their wish to participate in class, and Student A's justification, the bond between Student A and Student B was leveraged to enforce and justify the bullying Plaintiff and denying Plaintiff equal access to the classroom. The message from Student A was, "we count, you don't, we matter, you don't, we have value, you don't, we belong, you don't" serving to manufacture belonging, intimacy, and exclusivity at the expense of Plaintiff's ability to participate in class and pressure Student B to go along with it. This systematic, deliberate, and calculated exclusion and humiliation along with adult support of Plaintiff's removal deprived Plaintiff of equal access to education and caused lasting harm including years of intense shame, inability to participate with their peers in class and PTSD. See e.g. E.j (short term consequences), E.k (long term consequences) for more details. Student A and Student B have maintained a relationship to this day, and can be seen together on Instagram.

64.     Plaintiff informed Defendants that they felt unwelcome in the "friend group." Rather than inform Plaintiff that membership in a particular "friend group" is not a prerequisite to class participation and ensure they were allowed to participate in class, Defendants supported

24

and enforced the students' targeted removal of Plaintiff from class participation on the basis of

Plaintiff's sex/disability using "friend groups" as a pretext. See sections E.g (action taken), E.h.7

(friend groups is a pretext for discriminatory removal from the class environment).

**f.8. Student A's deliberate, systematic, humiliating, and degrading conduct denied Plaintiff**

**equal access to class participation and more generally school itself. Defendants were aware**

**of the incredibly distressing effect it had on Plaintiff and their resulting suicidal thoughts.**

**Plaintiff engaged in a protected activity by seeking support for their disability. Plaintiff's**

**disability was obvious and communicated. Defendants knew of Plaintiff's disability and**

**that Plaintiff required support and accommodation to be able to participate in class.**

65.    Plaintiff was unable to focus on their schoolwork during French class and

struggled to in the class prior to it (AP Statistics), as well as more generally throughout the

schoolday, as their mind was distressed over how they would stop the next few hours of

deliberate isolation and humiliation. Defendant Valand was aware Plaintiff's severe distress was

preventing them from focusing on "other stuff."

66.    Plaintiff shared with Defendants how their distress felt "terribly demotivating and

gripping," "don't want to do anything," "all the time" "never goes away" and "terrible anxiety

that prevents normal interaction," "lasting many hours at a time." Plaintiff made Defendants

aware of their distress/anxiety disability.

67.    Plaintiff informed Defendants both verbally and in documents shared with them

that this situation had caused them to feel suicidal in the past, though they were not occurring at

the time of sharing.

68.    Plaintiff, would often seek advice from Defendants on the cause of and how to

deal with their distress stemming from this situation.

69.     Defendant Valand has stated they understood Plaintiff was "absolutely" distressed. Defendant Valand noted it was impairing Plaintiff's ability to focus and "made things hard."

70.     Plaintiff's disability was obvious and communicated and Defendants were aware of Plaintiff's disability, and of their need for assistance to be able to participate in class and other school activities.

71.     Plaintiff sought explanations and assistance from Defendant Valand regarding their distress and potential social deficiency (struggle to get "social cues"). Plaintiff sought advice on what they were supposedly doing wrong so the other students would allow them to participate in the class environment

72.     Plaintiff engaged in a protected activity by seeking support and assistance with their potential communication disability ("getting social cues") and their severe and persistent distress to be able to participate in class.

73.     Plaintiff was afraid and unable to speak to their peers in class, feeling problematic, guilty, and ashamed for even wanting to. Plaintiff expressed and Defendants understood that they felt unwanted and problematic showing up to class and wanting to participate.

74.     On a handful of occasions, Plaintiff would go outside in the halls and break down in tears. Defendants were made aware of these incidents.

75.     The framing and shaming Plaintiff as a problem for showing up to class and wanting to participate, by both the bully and eventually a friend, and eventually the institution

itself, caused Plaintiff severe emotional distress. Plaintiff's inherent presence and basic wish to participate in class and not be incessantly humiliated was recast as a problem; as an issue to be dismissed.

76.    Plaintiff shared with Defendants how Plaintiff's isolation in school was resulting in loss of motivation and inability to engage in both classroom, academic, and extracurricular activities.

77.    Defendant Valand has acknowledged Plaintiff raised concerns in "numerous meetings" with himself and Dan Kholer, as well as in an email Plaintiff purportedly sent to the school board "claiming the existence of a toxic social environment at the high school."

78.    As Defendants' actively supported and enforced the harassment, Plaintiff fell further into severe distress and isolation, ultimately resulting in years of isolation, severe distress, and a PTSD diagnosis. See sections E.j (short-term consequences), E.k (long-term consequences).

**g. With knowledge Plaintiff's description of events and in response to Plaintiff's attempts to understand, on the basis of Plaintiff's sex/gender and disability, Defendant Valand framed Plaintiff's distress and desire to participate in class with their peers as inappropriate, sexually predatory, obsessive, and criminal stalking behavior, that could get Plaintiff in trouble with law enforcement, and coordinated a similar response with other staff and Plaintiff's parents.**

**g.1. Defendants understood Plaintiff was not romantically interested and the students' behavior was intended to remove Plaintiff from class participation on the basis of sex.**

79.    Plaintiff expressed several times and Defendant Valand acknowledged that they

were not romantically interested with any of the students involved.

80.    Defendants were informed and understood that the abuse Plaintiff was enduring was happening on a routine basis in class.

81.    Defendants have stated Student B's conduct were purposeful attempts to ensure the "relationship," (Plaintiff's participation in the class environment) did not "continue." In reality, these were attempts to avoid addressing the abusive classroom situation. See ¶59.

82.    Plaintiff shared their belief that the students' behavior was somehow neutral. Defendants, however, understood these as deliberate attempts to remove Plaintiff from participation in the classroom environment and believed Plaintiff was missing the "social cue" to leave. See e.g. ¶44. (Plaintiff mistakenly believed actions were neutral social choices; Defendants disagreed).

83.    Plaintiff informed Defendants they felt they were being removed because the other students wanted "girl time" the basis of sex (see ¶48 for factual basis), and that they wanted to be treated as if they were a girl.

**g.2. Defendants referred to Plaintiff's distress and wish to participate in class as an "infatuation," unwanted "relationship," "seeking affection," "aggressive," attempts to "get close" to Student B, a "chase," "stalking behavior," "intimidating," and warranting potential police involvement, as they verbally referenced Plaintiff's gender.**

84.    Despite this, Defendant Valand characterized Plaintiff's distress and wish to participate in class conversations with their friend (Student B) as something to the effect of an "infatuation." Defendant has indicated this was "especially" concerning because of Plaintiff's gender. See e.g. h.2.

85.    Defendant Valand characterized Plaintiff's wish to participate in class as "aggressive." Defendant has since explained this was because they believed Plaintiff was seeking "affection" and targeting the students, despite the fact Defendant was aware this was happening in every class and Plaintiff explicitly disclaimed romantic interest.

86.    Defendant Valand has since asserted that, because Plaintiff had "ruminated" on the issue for a long time, Plaintiff "wanted to … I dunno," and said this was the kind of thing that made "females, especially" feel worried and concerned. The "rumination" Defendant Valand referred to was Plaintiff expressing their constant distress and attempts to resolve the situation.

87.    Defendant Valand has framed Plaintiff's wish to engage with the other students in class as concerning because Plaintiff was trying to "get close" to them, which was "especially" concerning because Plaintiff was a "larger male" and they were "females," and that Plaintiff had to "back off" or this could become "quite the problem" for Plaintiff.

88.    Defendant Valand has stated that Student B had been communicating that "[they didn't] want this relationship to continue, and for some people that can be hard to tell what's going on, I think maybe that was the case." It appears the "relationship" Defendant Valand was referring to was the relationship where Plaintiff would show up to class, sit down in their usual seat, and periodically attempt to participate in peer conversations and work happening on a daily basis in front of them during independent and group work time. By framing these basic educational activities as a "relationship" or "forced friendship," Defendant Valand supported the students' removal of Plaintiff from the educational environment, and criminalized their wish to participate. Additionally, Student B's avoidance was in response to Plaintiff raising concerns about the harassment in class, not any inappropriate conduct or wish to not be friends, and

Defendants were aware of this. See ¶59. Defendants has explicitly stated that their attempts to participate in class conversations were inappropriate due to their gender. See h.2. Additionally, the terms "relationship" and "forced friendship" were pretexts to support Plaintiff's removal and segregation in the class environment on the basis of sex and disability. See h.7.

89.    Defendant Valand put forward the idea that Plaintiff could be intimidating Student B and making them uncomfortable as justification for the way Plaintiff was treated.

90.    Defendant Valand told Plaintiff Student B was "not [their] friend" or something very similar, dismissing Plaintiff's objections to the contrary. Plaintiff had been friends with Student B, and told Defendants of the details of their friendship with Student B. See ¶59.

**g.3. Defendants' ultimately enforced their discriminatory perspective by coordinating with other adults, labeling Plaintiff's insistence on participating in class as criminal conduct ("stalking behavior"), and "warning" Plaintiff of serious, potentially criminal consequences for continuing to insist on participating, and telling Plaintiff they could no longer talk to them about this situation, and <u>only</u> this situation. Plaintiff ceased raising concerns, fearing they could get in serious trouble for continuing to push back.**

91.    At the end of Plaintiff's routine interactions with Defendant Valand, Defendant Valand characterized Plaintiff's wish to participate in class as "stalking behavior" and something along the lines of "the chase." Defendant Valand warned Plaintiff that they could get in trouble with law enforcement "if people get scared," and that this could become "quite the problem" for Plaintiff. Defendant has explicitly cited Plaintiff's gender as a cause for these concerns. See ¶123.

92.    In the same meeting, immediately following the prior paragraph, Defendant

Valand informed Plaintiff they could not talk to them about this situation **only**, going as far as to emphasize that they could come to them about **anything else, just not this situation**.

93.    Defendant Valand coordinated with Defendant Bloom, the other adult responsible in the counseling department, to adopt the same discriminatory response. See ¶157.

94.    Defendant Valand met with Plaintiff's parents, and communicated to them that Plaintiff had trouble respecting boundaries, and expressed concern Plaintiff could get in serious trouble if they did not learn what they were doing. Defendant Valand was aware of how Plaintiff was isolated from a friend in class and treated as less than human. However, to the best of Plaintiff's parents' recollection, Defendant Valand did not share any of those details with Plaintiff's parents, instead telling Plaintiff's parents something along the lines that Plaintiff was obsessed with a girl, and not taking no for an answer.

95.    Defendant Valand has since asserted that they believed Plaintiff could not demand to be treated as if they existed in class.

96.    Defendant Valand's message that Plaintiff was "missing a social cue" that they were unwelcome in class was intended to shame Plaintiff for failing to understand and accept that targeted bullying intended to drive someone out of class, exclusion, and/or discrimination was viewed by both staff and students as socially acceptable conduct at SSHS.

97.    Defendant Valand discouraged Plaintiff from self-advocating, characterizing peers' exclusion of Plaintiff as "respectful" and implying that Plaintiff's attempts to participate were inappropriate, threatening, and socially inappropriate.

98.    Defendant Valand's response resulted in Plaintiff further isolating themselves and ceasing to raise concerns with the staff, fearing serious punishment. See e.g. j.1 (stopped

31

engaging with students and staff), j.4 (description of intense shame and fear of punishment), k (long-term effects, suicide attempt, PTSD).

**g.4. On the basis of sex and disability, Defendants' supported the students' authority to remove Plaintiff from the class environment, declaring it as allowed and "not against the rules," and characterizing Plaintiff as "missing the social cue" to leave, with knowledge the bullying and isolation was causing Plaintiff immense distress and harm, thereby supporting Plaintiff's removal from class participation.**

99.    Defendant Valand has since stated that students were allowed to "hurt" Plaintiff by excluding them from class participation, every day, for months or years on end, which was justified because Plaintiff had "intentionally, pursued them repeatedly." The Defendants' "pursuit" narrative was based on Plaintiff's sex (see ¶123) and disability (see h.3). Plaintiff sat in the same seat every day and had been attempting to interact with their peers who also sat in the same seats. This is class participation and refusal to accept bullying and discrimination, not a "pursuit."

100.    Defendant Bloom supported the students' known distressing attempts to remove Plaintiff from the class environment, encouraging Plaintiff to accept their removal and emphasizing to "respect their choices."

101.    Defendant Valand has since asserted that the students' removal of Plaintiff from class participation was allowed, on the basis of sex (see ¶122), that it's "not against the rules," and that Plaintiff could get in serious, even criminal, trouble for insisting otherwise. See ¶91.

102.    Defendants supported the students' targeted removal of Plaintiff from class participation on the basis of sex and disability using "friend groups" and "friendship" as a

32

pretext. See h.7.

103. In response to Plaintiff's concerns, Defendant Valand said something along the lines of "with friendship it doesn't have to be fair." However, this comment did not address friendship. It excused targeted removal from class participation and reassert the authority of those enforcing it, signaling to Plaintiff that fairness and participation in class were privileges controlled by "female" students rather than rights.

104. Defendant Valand has stated that Plaintiff was missing the "social cue" to leave.

105. Defendant Valand has stated that "people do cues," where they are "respectfully" are going to "not take your invitation." Defendants were asserting that Plaintiff's civil right to participate in class was contingent on whether other "female[s]" felt like "inviting" them.

106. Throughout the sessions with Defendant Valand, and in response to Plaintiff's attempt to understand, Defendant Valand expressed concern that Plaintiff was problematic for "not getting the social cue" that Plaintiff was not welcome to participate in class – misleading Plaintiff further into low self esteem and distress by supporting the harassment calculated to remove Plaintiff.

107. Valand dismissed Plaintiff's attempts to raise concerns as "social mistakes," demonstrating deliberate disregard for Plaintiff's rights and access to class and the educational institution as a whole, and reinforcing the students' authority to control Plaintiff's participation in class.

108. Through these assertions, Defendant Valand effectively ceded control of the classroom environment to the harassers, resulting in an inability for Plaintiff to object due to fear of serious consequences, removal from class participation, and an intensification of Plaintiff's

distress. See section j.

**g.5. Defendants' actions did not further any important government interest, and in the alternative, even if they did, their actions were not substantially related to such an interest. Defendants' actions were not rationally related to achieving any legitimate goal, and were wholly arbitrary, irrational, and abusive.**

109.     Defendants had no reason to believe Plaintiff was romantically interested or behaving inappropriately. See section h.1.

110.     Defendants' framing of Plaintiff's mere participation in class as inappropriate and criminal "stalking behavior" on the basis of sex was divorced from any legitimate educational or governmental interest and, in fact, subverted the school's fundamental objective of encouraging class participation and peer collaboration.

111.     Such action is not substantially or rationally related to achieving any legitimate governmental objective. Framing Plaintiff's participation in class as inappropriate and criminal stalking behavior does not promote participation, resolve any social conflict, or comply with established pedagogical standards, rather, it achieves nothing besides restricting Plaintiff's ability to participate in class, silencing Plaintiff, and causing immense emotional distress and shame when attending class or wishing to engage with their peers.

**g.6. Defendants' response to Plaintiff's concerns would chill any person of reasonable firmness from continuing to speak, raise concerns about discrimination, or seek support for their disability (distress), and their actions did in fact prevent Plaintiff from doing so, causing Plaintiff to fear serious punishment. Defendants' took adverse action against Plaintiff in response to their complaints.**

112.    Supporting Plaintiff's removal from class participation, labeling their distress and insistence on participating in class as criminal stalking behavior, and asserting the police could get involved shortly followed by instruction not to engage about this topic **and only this topic**, would chill any person of ordinary firmness from continuing to advocate for their inclusion or raise concerns, let alone a minor student at a school. See also g.3. Defendant Valand reframed Plaintiff's legitimate reports of harm as serious misconduct warranting police involvement, knowingly disregarding the visible and acknowledged reality of Plaintiff's experience and distress. Additionally, Defendants asserted that Plaintiff's raised concerns were inappropriate ("social mistakes"), shared their perspective with parents, and coordinated with other staff to treat Plaintiff's speech and concerns as criminal stalking behavior. This is action that would chill and dissuade any person of ordinary firmness from continuing to speak, raise concerns of discrimination, or seek support for their distress or disability. This did in fact stop Plaintiff from doing so, fearing serious punishment (see section j.1).

113.    Defendants' actions were caused by and were taken in response to Plaintiff raising concerns about discrimination, bullying, and harassment. See section f for Plaintiff's protected actions. Defendants' actions were intended to suppress Plaintiff's speech and complaints. See ¶92 (instruction to stop speaking happened immediately after assertions of criminal conduct and police involvement).

**h. Defendants' used Plaintiff's recognized disability (severe distress), perceived disability (social ineptitude), and sex/gender stereotypes to justify Plaintiff's removal from class participation, actively supporting the bullying, refusing support, and framing Plaintiff as a sexual predator.**

**h.1. Plaintiff was similarly situated to the other participants in class as a student interested in participating with their peers. Defendants' have stated that Plaintiff did not wish to cause problems or create any fear, and have stated Plaintiff was "very polite." Defendants' had no factual basis to believe Plaintiff was romantically interested or behaving inappropriately.**

114.    Plaintiff was similarly situated to the other participants in class as a student interested in participating with their peers.

115.    Plaintiff expressed several times and Defendants acknowledged that they were not romantically interested with any of the students involved. Indeed, Plaintiff has since discovered they are not romantically or sexually attracted to females at all.

116.    Defendant Valand has stated they were aware Plaintiff had "no intentions of causing any problems or creating any fear, or concern."

117.    Defendants had no non-discriminatory reason to believe Plaintiff was "infatuated" or that Student B had not been their friend. Plaintiff had been friends with Student B. See ¶59. Plaintiff informed and Defendants were aware that they had been friends.

118.    Defendants had no concrete reason to believe Plaintiff was intimidating others or otherwise causing discomfort. To the contrary, Defendant Valand characterized Plaintiff as "very polite" in their interactions with Plaintiff.

119.    Defendants had no legitimate, non-discriminatory reason to tell Plaintiff that they could not demand to be treated as if they existed in class. This belief is contrary to educational standards and the obligation to ensure equal access for all students.

120.    When asked if they were aware of anything Plaintiff did to that would justify such

a response from the students, Defendant Valand could not provide any substantive response.

121.    Defendant Valand had no legitimate, non-discriminatory basis to dismiss Plaintiff's numerous complaints and distress as "social mistakes."

**h.2. Defendant Valand repeatedly cited Plaintiff's gender to support their conclusions that Plaintiff's wish to participate in classroom conversations was inappropriate.**

122.    Defendant Valand asserted that it was inappropriate when someone "keeps trying to insert themselves," and keeps on "trying to get close to someone else, especially if one is male, and, in your case like a pretty, you know, a larger male, and then there's a female…" The "insertion" Defendant is referring to was Plaintiff's attempts to participate in classroom conversations.

123.    As a justification for "the chase," "stalking behavior," getting in trouble with law enforcement, and denial of support/suppression of speech, Defendant Valand cited the fact that Plaintiff was "you know, a larger male, and then there's a female."

124.    Defendant Valand has since suggested that, because Plaintiff had "ruminated" on the issue for a long time, Plaintiff "wanted to … I dunno," and said this was the kind of thing that made "females, especially" feel worried and concerned.

**h.3. Defendant Valand framed Plaintiff's disability (severe distress/inability to think) as sexually predatory, justifying Plaintiff's removal from class participation.**

125.    Plaintiff expressed confusion and sought clarity on the cause of Plaintiff's distress.

126.    Defendant Valand's characterizations ("chase," "stalking behavior," "infatuation") of Plaintiff's constant distress/anxiety/inability to concentrate or think recast

Plaintiff's disability as sexually predatory.

127.    Defendant Valand characterized Plaintiff's constant distress as sexually predatory, asserting that because Plaintiff had "ruminated" on the issue for a long time, Plaintiff "wanted to … I dunno," and that this kind of thing made "females, especially" feel worried and concerned.

128.    This supports the inference that Defendant saw Plaintiff's wish to engage with their peers as dangerous and sexually predatory due to their distress/disability, and supported their removal on this basis.

**h.4. Defendant Valand regarded Plaintiff as having a communication disability. Defendant framed Plaintiff's distress and otherwise normal behavior as inappropriate, using it as evidence that Plaintiff was socially inept and incapable of recognizing "social cues."**

129.    Plaintiff communicated to Defendant Valand their misguided belief that they were socially inept and struggled to get "social cues." Plaintiff sought guidance from Defendant Valand on what they were supposedly doing wrong so that the other students would allow Plaintiff to participate. See h.4 for more evidence of how Defendant regarded Plaintiff as having a communication disability.

130.    In one isolated incident, Defendant Valand made a remark Plaintiff experienced as distressing and offensive. Plaintiff does not recall exact words used, but understood the remark to redirect blame for the mistreatment Plaintiff was experiencing. As a result, Plaintiff attempted to continue the conversation with Defendant Valand to obtain clarity on what was said. This resulted in Plaintiff following Defendant Valand to their car while actively attempting to obtain clarity on what was said. Plaintiff did not physically block Defendant, threaten Defendant, or coerce Defendant in any way. Defendant Valand, however, mischaracterized this

38

incident as evidence that Plaintiff was socially inept and incapable of recognizing the "social cue" that the conversation was over, rather than a frantic attempt to obtain desperately needed clarity. Plaintiff had not been aware this was a big concern, as it was common for drama troupe kids to walk out to their car with the teacher after drama troupe. Defendant Valand has since referred to Plaintiff's general demeanor in their interactions as "very polite."

131.    In another case, Plaintiff waited outside Defendant Valand's office while he was meeting with another student in order to speak with him when he became available. Plaintiff's intent was simply to obtain support and assistance. Defendant Valand later characterized this conduct as something along the lines of creepy and socially inappropriate, even though waiting outside a staff member's office to speak with them is an ordinary way students seek help. This characterization was shared with Plaintiff's parents in the meeting.

**h.5. Defendants leveraged Plaintiff's purported inability to get social cues (communication disability) as a pretext to justify their removal from classroom participation and to frame Plaintiff's class participation as sexually predatory and inappropriate.**

132.    Defendant Valand stated they were concerned that Plaintiff was "missing the social cue" that Student B "[did not] want this relationship to continue." The "relationship" Defendants referred to was Plaintiff's participation in classroom conversations. See ¶88 for full quote. Defendant Bloom also adopted this position. See ¶157.

133.    Defendant Valand's message that Plaintiff was "missing a social cue" that they were unwelcome to participate in class was intended to leverage Plaintiff's purported disability to normalize targeted bullying, isolation, exclusion, and/or discrimination as socially acceptable student conduct.

134.    Defendant Valand framed Plaintiff's insistence on participating in class conversations as a "social mistake."

135.    Plaintiff evidently did receive the "social cue" to leave, as shown by their severe distress and statements explicitly acknowledging the students' intent to harass Plaintiff to achieve their removal. See ¶38. Defendants' assertion that Plaintiff was missing a "social cue" was nothing more than a pretext to justify Plaintiff's removal, as well as justify the assertion that their continued class participation was inappropriate.

136.    By framing the Plaintiff's attempts to participate as a disability-related failure to read cues, Defendants supported Plaintiff's removal from class participation and framed it as inappropriate and sexually predatory due to their perceived communication deficiency.

**h.6. Defendants' inexplicably privileged the other students' discomfort over Plaintiff's visible and severe distress.**

137.    Defendants' put Student A and B's secondhand discomfort over Plaintiff's visibly noted severe distress and right to exist and participate with dignity in the classroom.

**h.7. Defendants' stated "unwanted relationship," "forced friendship," and "friend group choices" are pretexts for discriminatory denial of equal access to the class environment**

138.    Defendants repeatedly reframed the students' systematic, deliberate, humiliating, degrading, and discriminatory conduct calculated to remove Plaintiff from the class environment as "friendship choices" intended to enforce the boundaries of the students' "friend group."

139.    Defendants assert that, because the students did not want Plaintiff in their "friend group," they were allowed to coordinate to isolate and remove Plaintiff from class participation. See g.4 for Defendants' support of removal from class participation.

140.    However, in combination with Defendants' overtly discriminatory statements, "friendship," and "friend group choices" were simply pretexts for supporting Plaintiff's removal on the basis of sex/disability. "Friendship" or membership in a particular "friend group" is not a requirement to attend class or participate in classroom conversations, and the lack of "friendship" does not justify a campaign of targeted harassment intended to remove someone from participation in the class environment on the basis of sex or gender. Additionally, facts known to Defendants do not support a conclusion that Student B did not want to be Plaintiff's friend, rather, that Student B was pressured by a campaign of harassment to isolate Plaintiff. See ¶59.

141.    Additionally, Defendants were not referring to ordinary friendship. Defendants framed Plaintiff's participation with the other students in class as an unwanted "relationship" that Plaintiff struggled to tell that the other students did not want to "continue." See ¶88. Defendants have also characterized it as attempts to "get close," "seeking affection," "the chase," and "stalking behavior" (see g.2) on the basis of Plaintiff's sex (see ¶123). Plaintiff was simply showing up to class and attempting to participate in conversations happening in front of them, and expressing their distress due to the constant bullying, humiliation, and isolation they were subjected to. By framing basic classroom engagement and participation as a "relationship" or "forced friendship," Defendant Valand justified the students' removal of Plaintiff from the educational environment on the basis of sex and disability. Plaintiff had explicitly informed Defendants they were not romantically interested, yet Defendants still viewed Plaintiff's interaction with their peers as substantively different than ordinary peer participation or friendship. Defendants leveraged sex and disability stereotypes to justify denying Plaintiff equal access to the classroom and counseling resources, as well as labeling their wish to participate in

41

class as criminal conduct.

**i. The individual Defendants were responsible for Steamboat Springs School District's response to Plaintiff's concerns.**

**i.1. Relational bullying is a form of bullying**

142.    Relational bullying is a well-documented form of bullying recognized by the CDC (https://www.cdc.gov/youth-violence/about/about-bullying.html), HHS (https://www.stopbullying.gov/bullying/what-is-bullying), and even SSHS's own student handbook (https://sshs.steamboatschools.net/parents/student-handbook).

143.    Relational bullying is deliberate harmful behavior intended to harm a target's reputation, social standing, and/or relationships.

144.    In this case, Student A's bullying was also intended to deny Plaintiff equal access to education by systematically refusing to allow them to participate in all classroom conversations, and coordinating with other students to remove them. See section f.

145.    The students' conduct constituted a pattern of physical acts and gestures, such as deliberately turning away, whispering, and exiting together in front of Plaintiff intended to remove Plaintiff from the classroom environment and humiliate and coerce them into isolation. These actions meet the statutory definition of bullying under C.R.S. § 22-32-109.1 (1)(b).

146.    Additionally, such behavior can be termed "mobbing" when several individuals support irrational and targeted behavior to drive a peer out of a shared environment.

**i.2. SSSD delegated authority to the counseling department to respond to bullying and other student concerns.**

147.    As mandated under C.R.S. § 22-32-109.1, SSSD has a bullying prevention policy.

148.    This policy can be found at

https://docs.google.com/document/d/1_RpJ3_R3r7VrfvilkESskcin_iav4J71m3kPLjQxVkM/edit?tab=t.0

149.    The bullying policy states that "appropriate action" can be taken by the "principal or principal's designee"

150.    See the high school's student handbook, signed by the principal, stating that the counseling department is responsible for handling bullying. See

https://sshs.steamboatschools.net/parents/student-handbook.

151.    Defendants Valand and Bloom, as members of the counseling department, had authority to address bullying on behalf of the institution.

**i.3. Other staff and the school board referred the situation to the counseling department**

152.    Plaintiff raised concerns with Katy Lee, the president of the school board, in conversations during the school's drama troupe. On information and belief, the district referred the situation to Defendant Valand. This is supported by an email from Defendant Valand, which asserted the existence of an email Plaintiff purportedly sent to the school board, "claiming the existence of a toxic social environment at the high school." Plaintiff never sent such an email, nor informed Defendant Valand of their conversations with Katy Lee.

153.    Plaintiff had been raising concerns with Dan Kholer (assistant principal/on information and belief a deputy Title IX coordinator at the time), in an attempt to address the way they were being treated in class and more broadly at school. While Dan Kholer provided limited support, he acknowledged he was not best equipped to handle Plaintiff's situation, and that Defendant Valand and other counselors were appropriate people to work with regarding

43

their concerns.

154.    Tanya Rivera-Vigil saw Plaintiff crying alone in a common space. They referred
Plaintiff to the counseling department for assistance regarding student mistreatment.

**i.4. Mental/Behavioral health professionals are in their own department.**

155.    The district's organizational chart can be found at

https://docs.google.com/drawings/d/1tNF8tw6RGQZXDB3RDYt15L8GC2Ef0b0FERiEXBMQ
NAE/edit

156.    According to the organizational chart, Mental/Behavioral Health services are
under the district's behavioral health manager (Shelby DeWolfe), not under any principal or
assistant principal. As such, Defendant Valand was the authority on site responsible for the
district's response to Plaintiff's situation.

**i.5. The individual Defendants, acting as SSHS's counseling department, coordinated to
adopt the discriminatory response.**

157.    Plaintiff had told and Defendant Bloom was aware of the ongoing campaign of
harassment and it's goal to remove Plaintiff as a participant from the shared educational
environment, and the resulting distress Plaintiff was enduring, and how it prevented them from
engaging in school (See f, f.8). Defendant Bloom was involved with handling the situation in
correspondence with Plaintiff's parents. In response to Student B ghosting Plaintiff and giving
Plaintiff the side eye after Plaintiff ceased participating in class or interacting with their peers for
months, Defendant Bloom reinforced that the abusive behavior was acceptable, and emphasized
respecting Student B's "choice" to dehumanize and disregard Plaintiff and go along with the
bullying, and informed Plaintiff that "the ball was in her court," further isolating Plaintiff,

scaring Plaintiff from speaking up, and preventing Plaintiff from recognizing or addressing the bullying. See ¶167. Student B's negative actions only started shortly after Plaintiff had objected to the abuse. See ¶59. Plaintiff told and Defendant Bloom was aware of the students' campaign intended to remove Plaintiff from the classroom environment. This conduct is in line with Defendant Valand's narrative, and Defendant Valand stated that they likely worked with and informed Defendant Bloom that Plaintiff had issues respecting boundaries. This demonstrates Defendant Valand's authority as the school's designated mental health professional to determine the counseling department's response.

**i.6. Defendant Valand re-asserted their discriminatory reasoning in a phone call several years later, in June of 2025.**

158.    In a phone call in June 2025, Defendant Valand re-asserted their discriminatory reasoning, demonstrating their perspective and assertions were not a momentary lapse in judgment, but rather an institutional choice to discriminate against and remove Plaintiff on the basis of sex and disability.

**i.7. Summary**

159.    Defendants Valand and Bloom's actions reflect discriminatory action on behalf of Defendant SSSD and Defendant SSSD's counseling department, minimizing and dismissing Plaintiff's visibly severe distress while reinforcing Student A and B's purported "right" to deny Plaintiff access to class, discriminating on the basis of Plaintiff's sex and perceived and actual disability. Instead of addressing, investigating, or denouncing the conduct and concerns raised, several school employees responsible for addressing the situation further blamed and framed Plaintiff as sexually predatory and criminal for continuing to show up to class, object to bullying

45

and discrimination, and seek basic dignity and respect from their peers.

**j. Defendants' active support of the harassment (see e.g. section g.3 and g.4) resulted in deterioration of the situation, and denied Plaintiff meaningful access to the educational environment.**

**j.1. Plaintiff ceased raising concerns with staff or engaging with the students, fearing they could get in serious trouble because of Defendants' implied threats (see e.g. section g.6 for cause of their fear).**

160.    Plaintiff ceased interacting with Defendant Valand and all staff members regarding the situation, fearing they would get in serious trouble for continuing to push back.

161.    Plaintiff withdrew from peer engagement in French class.

162.    Plaintiff began eating lunch alone, previously eating lunch with Student B and mutual friends.

163.    Plaintiff was silenced, excluded, and forced to accept and "respect" ongoing peer discrimination, abuse, and mobbing with active support from staff, and, purportedly, the police.

**j.2. Defendants lended institutional force to the power imbalance, resulting in Plaintiff isolating themselves in and out of class, intensification of Plaintiff's distress, and inability to speak out.**

164.    Defendants' discriminatory actions directly intensified Plaintiff's distress. Plaintiff ceased interacting with Student A or B in and out of class to "respect their choices" and in hopes the distress would go away. Instead, Plaintiff's distress towards the situation and students involved intensified, as Plaintiff's safety in class now directly appeared contingent on their thoughts and feelings.

165.    The message of "you're the problem for showing up to class and wanting to participate" was no longer some kids being immature, it was now backed by adults, accusations of criminal stalking and chasing, and "warnings" of potential police involvement, asserted on the basis of sex and disability. The adults converted peer harassment into institutional policy.

166.    Defendants' discriminatory actions made the perceived power imbalance real, rendering Plaintiff even more vulnerable to the bullying Defendants' were obligated to stop. Avoiding Student A and B in class wasn't respect, it was further humiliation.

**j.3. As Plaintiff "respected" the bullying, the bullying escalated and the students doubled down. Plaintiff once again sought assistance, but Defendants reinforced the discriminatory narrative and continued to support the harassment.**

167.    As Plaintiff respected the bullying dynamic as instructed, the bullying got worse and caused Plaintiff even more severe distress. A few months into social isolation, upon attempting to return after leaving failed to resolve the distress, Student B began ghosting Plaintiff and giving Plaintiff the side eye. While Plaintiff cannot confirm what Student B was or was not told, the unexplained shift in their behavior, combined with similar prior instances with Student Y (who had recently befriended them), leaves Plaintiff with the inescapable conclusion that Student B likely was told some false allegation about Plaintiff (such as "following in the hallways," said by Student Y in section a), causing them to judge, disdain, and further isolate Plaintiff. Additionally, Student B later accepted Plaintiff's apology for "how they treated them," indicating that they believed Plaintiff had done something wrong. Given the lack of any real misconduct and the gendered prior incident with Student Y in ¶5, Plaintiff believes any false allegations leveraged gendered stereotypes, expectations, and fears.

47

168.     Plaintiff brought this situation to the attention of Defendant Bloom, who reinforced that the students' removal of Plaintiff was acceptable and that Plaintiff needed to respect their choices, reinforcing the message that Plaintiff was the problem for being unwilling and unable to accept the abuse. Defendant Bloom coordinated with Defendant Valand on this matter. See ¶157 for more details.

169.     Addressing the harassment and expecting dignity and nondiscrimination was made impossible by Defendants' discriminatory and unlawful actions, framing of Plaintiff's insistence on participating in class as criminal stalking behavior, and direction to "respect their choices" as they actively chose to isolate, humiliate, retaliate against, and bully Plaintiff. Everyone's discomfort was pushed onto Plaintiff, the easy target with institutional backing, while the bullying was normalized, enforced, and justified.

170.     Plaintiff believes the reason everyone was framing Plaintiff as the problem was because Plaintiff was too accommodating, confused, and scared to speak out. For the students and staff, it was simply easier to blame and shame Plaintiff rather than confront the uncomfortable truth.

**j.4. Defendants discriminatory actions warped reality, causing Plaintiff to internalize shame, feeling inappropriate and problematic for wishing to participate in class with their peers, and further isolating themselves and withdraw from class participation.**

171.     Under the institutionally asserted framing of Plaintiff as a predator, every legitimate effort made by Plaintiff to engage with peers, including speaking in class, seeking inclusion in group activities, or asserting the right to fair treatment, was seen by Plaintiff as inappropriate and dangerous, warranting serious consequences and police involvement. This

stigmatizing label effectively stripped Plaintiff of personhood both inside and outside the school

environment, rendering their attempts to engage with their peers unsafe and delegitimized. This

created a hostile, intimidating, and abusive classroom environment where Plaintiff was forced to

accept abusive treatment and was treated as a dangerous threat for wanting to assert basic human

dignity and participate in class.

172.    Plaintiff internalized the idea that they were inherently problematic for showing

up to class and wanting to participate, resulting in intense feelings of low self esteem and a deep

feeling of shame and self-hatred.

173.    Plaintiff became unable to speak out to others, worried they would get in trouble.

Plaintiff was trapped in a cycle of severe distress and need to address the ongoing bullying and

humiliation, followed by intense shame, fear of consequences, and fear of being seen as

dangerous and threatening for pushing back.

174.    As the bullying escalated, Plaintiff felt an even more desperate need to address the

harassment and abuse, but was unable to out of fear of misconduct or punishment, creating a

vicious cycle of distress. Plaintiff was forced to go along with Defendant Valand and the

students' narrative, fearing serious punishment for pushing back.

175.    Defendant Valand's portrayal of Plaintiff's wish to participate with their peers in

class as sexually predatory and Defendant Bloom's reinforcement ("respect their choices")

caused Plaintiff to view Student B's attempts to avoid Plaintiff and avoid facing the situation as

further evidence of Plaintiff's purported inappropriate and sexually predatory nature. This

reinforced the shame and guilt.

**j.5. Defendants' discriminatory actions created a hostile environment directly resulting in**

**tangible educational harm, including the decline of grades and test scores. Plaintiff's AP French score declined.**

176.    Plaintiff's motivation to participate in activities and engage with their peers declined. In Drama Troupe (a club), Plaintiff would often sit alone and avoid engaging with their peers.

177.    One of Plaintiff's teachers, Irene Alicot, commented that Plaintiff had not done A-level work. Plaintiff had been struggling due to their constant and ceaseless distress. Defendants were aware of Plaintiff's distress and resulting difficulty. See e.g. section f.8.

178.    Plaintiff was unable to focus during the AP French exam, which was taken in the same room as Student A and Student B, due to their intense and persistent distress. Student A and Student B continued to engage amicably with each other in front of Plaintiff during breaks in the exam. Plaintiff felt the same intense need to talk with them and address the situation, but due to Defendants' actions, this need instead triggered panic of feeling like an unwanted sexual predator who could get in trouble with the police for "pursuing" an unwanted "relationship." As a result, Plaintiff was unable to focus on the exam or set aside their intense distress, despite their best efforts. AP tests are graded on a score out of 5. Plaintiff got a 3 in this exam, declining from the previous years' 4. Plaintiff's goal was to improve their score, not reduce it, but was unable to due to both the systematic removal from class participation, constant humiliation in class, and ultimately the their participation with their peers being framed as sexually predatory and potentially criminal, creating a hostile environment where Plaintiff was unable to participate or focus.

179.    Additionally, on the AP Physics exam, which was taken immediately after the AP

French on (on the same day), Plaintiff struggled to focus during the entire exam, and got a 4.
During the break, Plaintiff informed one of their peers that they were struggling to focus due to
the situation.

180.    Plaintiff's grades and test scores suffered as they desperately yet futilely
attempted to push the distress away.

**j.6. Plaintiff moved to California the following year to avoid the hostile environment**

181.    The following year, Plaintiff moved to a new school, due in significant part to the
abusive environment they were subjected to at SSHS.

**k. Defendants' actions resulted in long-term isolation, shame, guilt when engaging with
peers, flashbacks, and a PTSD diagnosis. Plaintiff has been unable to engage with their
peers and scared to show up to class and participate in their education.**

**k.1. The intense guilt and shame ultimately resulted in a passive suicide attempt and long-
term damage to Plaintiff's mental health.**

182.    During the summer of 2023, while camping in Ontario, Canada, Plaintiff
knowingly walked on active train tracks for hours at a time with headphones and music on full
blast, thinking that, "at least if [Plaintiff] was dead, [the cycles of distress] would all be over." It
is well documented bullying can lead to negative outcomes such as school violence and suicide.
Plaintiff is now grateful they are not dead and are able to file this complaint. Plaintiff cares about
other people and would never hurt others, even as Defendants and students recklessly caused
profound emotional distress and injury. However, another student subjected to the same
mistreatment may have responded violently. Defendants' harmful actions put a student in
extreme distress, putting Plaintiff and the community as a whole at risk.

183.    The following school year, at a different school, Plaintiff was scared to speak with their peers; afraid of being bullied and framed as inappropriate for wanting to participate in class. As a result, Plaintiff avoided interacting with their peers.

184.    Plaintiff tried to suppress the feelings of distress for around a year, trusting Defendant Valand and others around Plaintiff that their needs and wish to participate in class was inappropriate, threatening and shameful. Plaintiff tried to cope in silence, lacking support and clarity. Plaintiff was scared to share what happened with people, because Plaintiff was afraid they would turn around, blame Plaintiff, shame Plaintiff for wanting to participate, and tell Plaintiff they were the problem.

185.    This suppression and delay in recognition were direct consequences of the environment shaped by Valand's authority and the other counselors' reinforcement of the distorted narrative.

186.    After a year, Plaintiff came to the conclusion that the feelings and thoughts weren't going away on their own, and began allowing themselves to think through and revisit what happened.

**k.2. Plaintiff was unable to grasp the abusive nature of the situation due to Defendants' and others' conduct, and as a result, believed their intense and persistent distress was caused by their own deficiency or inappropriate desire. Plaintiff has struggled with intense guilt, shame, and fear of getting in trouble when attempting to participate with their peers.**

187.    Plaintiff was trapped in a misguided belief that the students' behavior was not a big deal, and was a social misunderstanding, or at worst, some kids being socially selfish, and believed they were at fault for not being able to let it go and continuing to feel strongly about the

52

students in question. Plaintiff was obsessed, distraught, angry, and emotionally unstable towards the student situation, feeling an intense need to resolve the behavior, but due to Defendants' and others' assertions that the students' behavior was normal and acceptable if unpleasant ("it hurts"), and that Plaintiff's response was abnormal, obsessive, inappropriate, and even criminal, Plaintiff did not know nor reasonably could have known that their reaction constituted an injury or was caused by the tortious act of another. Plaintiff believed the students had simply been mean to them and socially selfish, which is not the factual basis of any legal injury. Plaintiff struggled to grasp both the wrongful and harmful nature of the student conduct at hand, due to Defendants' and other students and adults' dismissal, normalization, support, and enforcement of the abuse.

188.    At times where Plaintiff did understand in one form or another that the students' conduct was problematic or socially harmful, Plaintiff still believed the students' actions were allowed, acceptable, not against the rules, and not wrongful due to Defendants' own assertions, and the fact that, standing alone, being mean or unkind is not legally actionable. Plaintiff believed the students' actions did not rise to the level of harm that would result in years of constant distress, anguish, and anxiety. Instead, Plaintiff felt a strong need to address the social situation with their peers, which is not indicative of an injury. While Plaintiff was irritated Defendants did not intervene and defended the behavior, Plaintiff still believed that the students' were simply being mean and that their behavior was not sufficiently severe to cause years of unending, intense distress and obsessive thinking towards resolving the situation. This was directly caused by Defendants' and others' assertion that the other students' behavior was normal and acceptable (see section g.4 for support), and a "universal" High School experience (see ¶195

for quote), and that Plaintiff's response was abnormal, obsessive, inappropriate, or even criminal. See g.2. Plaintiff was aware of the accusations of stalking, chasing and criminal conduct, but believed these to be rational (if discriminatory) responses to Plaintiff's purportedly unjustified, intense, and unending feelings towards resolving the student situation and insistence on participating with these specific peers. Plaintiff did not know of the severity or abusive nature of the students' conduct, and did not know Plaintiff's constant and unending distress towards resolving the situation with the students was a medical response to abuse (trauma), rather than a result of their own inappropriate need or "chase," as Defendants' themselves contended. It was only when Plaintiff learned their symptoms closely resembled those of PTSD (Post Traumatic Stress disorder) did Plaintiff realize their feelings were caused by and symptoms of an injury. See ¶190 (for time of discovery)

189.    Plaintiff endured severe emotional distress as they attempted to reconcile their intense distress with the distorted narrative presented by Defendants' and those who appeared to Plaintiff to support Defendants' narrative (parents, Kholer, Student A, and Plaintiff's friend). It was a vicious cycle of Plaintiff feeling a strong need to address the humiliating conduct directed at Plaintiff, followed by strong feelings of shame, guilt, and an intense fear that Plaintiff's distress and needs were inappropriate, obsessive, and threatening and could get Plaintiff in serious trouble.

**k.3. In February of 2025, Plaintiff was diagnosed with PTSD and has been unable to participate in higher education.**

190.    In February of 2025, an online friend of Plaintiff mentioned the situation had given Plaintiff PTSD-like symptoms. Plaintiff immediately looked up the symptoms of PTSD

out of curiosity, and realized they had nearly all of them. At this point, Plaintiff started to realize

what truly happened. Plaintiff previously thought they were unstable, dangerous, obsessive, and

inappropriate due to the counselor and staffs' framing of their thoughts and distress. Upon

learning of PTSD, Plaintiff realized their symptoms were actually a researched, medical response

to trauma. Plaintiff immediately sought a diagnosis, and was formally diagnosed with PTSD a

few weeks later.

191.    Plaintiff's PTSD is directly tied to the situation at hand. For example, Plaintiff

entered a state of distress which hindered their ability to think and speak during a phone

conversation with Defendant Valand in June 2025. Additionally, in October 2025, after learning

Students A and B were still friends, Plaintiff experienced sustained panic and was unable to sleep

for two days. This is consistent with how PTSD is understood to function (a "trigger" resulting in

an emotional and somatic flashback), and, represents the reality that Student A and B's

relationship functioned as an institutionally endorsed weapon to isolate, humiliate and remove

Plaintiff from class. See e.g. g.4 (adult support of student authority) and h.7 (using "friendship"

as a pretext for discrimination).

192.    As a result of the severe and persistent distress, fear, and shame, Plaintiff was

incapable of focusing or participating in university. As a result, Plaintiff dropped out of the

Spring 2025 term, and was not able to enroll for the Fall 2025 term. This interruption in

Plaintiff's education continues to affect their long-term academic and career trajectory.

**k.4. Plaintiff has been unable to engage with their peers due to even the most basic
interaction being framed as unreasonable, predatory, and criminal.**

193.    Defendants' framing of even the most basic demands ("treat me as if I exist in

class") as unreasonable, predatory, and dangerous, has made it impossible to sustain healthy interpersonal relationships in institutional environments. Plaintiff has been unable to engage in ordinary activities required for healthy relationships such as keeping in touch with friends, setting boundaries, asking to hang out, pushing others to treat them with respect, or even showing up to class because these activities now trigger panic and fear responses associated with being told they were inappropriate, dangerous, wrongful, or warranting police intervention for wanting to engage with their peers. When a person can't ask anyone to do anything, they naturally end up alone and isolated.

**k.5. As of March 2026, Plaintiff still routinely experiences flashbacks involving intense feelings of guilt, shame, and distress, directly stemming from Defendants' actions.**

194.    On a routine basis (several times a week), Plaintiff experiences flashbacks, characterized by an intense conviction that the what happened was somehow acceptable, that Plaintiff was the ones at fault for wishing to participate in class in the first place, and that they had no choice but to accept the abuse, despite being unable to point to any non-discriminatory factual or logical basis for such assertions. Plaintiff believes this conviction is derived from many students and staff informing Plaintiff that what happened was acceptable, and implicitly threatening Plaintiff with criminal consequences for pushing back. See g (adults' harmful actions). At the time, Plaintiff believed (and perhaps correctly so) that they had no safe option other than to accept what happened was not an issue, or face serious or even purportedly criminal consequences. Plaintiff believes such flashbacks are likely to continue for the foreseeable future, given the fact they've happened on a routine basis (albeit with gradually decreasing frequency) for several years.

56

**l. Plaintiff had informed and other staff were aware of the situation, and responded in a dismissive and inadequate manner that reinforced the acceptable and normal nature of the conduct.**

195.    **Other staff responses:** Plaintiff also occasionally communicated with Britta Bodine, a math teacher, who towards the end of the year was aware of the situation and the harmful acts, and ultimately chose to do nothing and actively avoid engaging with it. Plaintiff had come to Bodine several times in clear distress, and Bodine had a 45-minute conversation with Plaintiff about the abuse they were enduring in class. Bodine was clearly aware of the aggression Plaintiff was enduring at the hands of their peers, stating in an e-mail "I recall that time in high school being challenging for you, especially when it came to relationships and social dynamics. … Your intentions in social relationships always came from a sincere place, even though it may not have landed well with your peers. … Those are universal struggles … High school is rarely a place where people are at their best or most kind, especially in terms of friendship and empathy." She also knew Plaintiff was enduring distress, remarking how "I know [belonging/friendship] felt especially heavy for you at times." Despite this, Bodine chose to minimize and dismiss the distress and bullying as high school drama, suggesting Plaintiff "lean into gratitude" and think positively. However, Plaintiff continued to be bullied despite trying their best to "think positively," demonstrating the advice was ineffective and dismissive. One must create and enforce a positive environment, not simply claim to do so while normalizing, excusing, and dismissing targeted hostility and abuse.

196.    **Other staff responses:** Plaintiff sent a CGIA notice as required under C.R.S. § 24-10-109 to Brad Meeks (Designated Agent/Former superintendent) and Celine Wicks

(Superintendent) on Jul 11, 2025. After receiving no response and wishing to ensure proper, effective, and correct notice under the statute, Plaintiff sent a clearly labeled copy to Brad Meeks, Celine Wicks, and Katy Lee (President of the school board) on August 7th. Plaintiff's GIA notice was a detailed, 3-page, single spaced notice explaining what happened in class, what Plaintiff told Defendant Valand, Valand's response (including direct quotes), other staff involved and their actions, the distressing effect it had on Plaintiff, Plaintiff's diagnosis, a preliminary damage estimate, Plaintiff's contact information, and other details. Plaintiff's notice complied with all requirements of C.R.S. § 24-10-109. Further, Plaintiff sent one email on October 27th, warning of imminent litigation and offering one final week to resolve this matter informally. The district made no contact with Plaintiff throughout this communication, except for an acknowledgment of receipt dated August 27th. On November 10th, 2025, after Plaintiff had filed suit, Celine Wicks responded to Plaintiff's email, stating "The District denies any wrongdoing associated with the broadly stated claims that you have asserted in your letter dated July 11, 2025, and subsequent duplicate letters, and emails." Instead of contacting Plaintiff in good faith to clarify any purportedly "broad" claims in Plaintiff's notice during the 90-day statutory evaluation period, Defendant SSSD instead responded in a dismissive, inaccurate, and vague way after Plaintiff had already filed suit; characterizing Plaintiff's good faith and detailed attempts to raise concerns, ensure proper notice under the law, and seek redress as improper ("broadly stated") and unnecessary or irritating ("duplicate"). This conduct is in line with Defendant Valand's and other staff's attempts to minimize Plaintiff's serious raised concerns followed by attempts to frame and shame Plaintiff's expression as problematic.

197.    Other staff responses: Plaintiff also communicated with Kristin O'Connor, a math

teacher, towards the end of the year, who told Plaintiff something along the lines of "we should talk it out." To Plaintiff's knowledge, she was the only employee who responded appropriately, however the bullying, distortion by other adults, and oppression was too far gone at that point for that to be a practical possibility.

F.      STATEMENT OF CLAIMS

## CLAIM I

### Violation of Title IX of the Education Amendments of 1972

### (Against Steamboat Springs RE-2 School District/SSSD)

198.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

199.    Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

200.    Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding.

201.    Steamboat Springs RE-2 School District (SSSD) is a public school district funded with $2,139,335 of federal funding in the 2022-2023 school year.

202.    Defendant Valand and Defendant Bloom were employees acting in their official capacities at Steamboat Springs High School (SSHS), a secondary school in SSSD. School counseling and adult supervision is a benefit of most education programs, including SSHS.

203. The counseling department, was designated by the District to manage student behavioral reports and bullying concerns at SSHS. Defendants Valand and Bloom were employed in and acted as SSHS's counseling department in response to Plaintiff's complaints. See section E.i.

204. **Intentional Discrimination by SSSD.** As described in section E.h (discrimination) and E.i (by the institution), Defendants intentionally discriminated on the basis of sex, gender, and presumed sexual orientation when responding to Plaintiff's concerns.

205. Defendant Valand's support of Plaintiff's removal (see e.g. section E.g.4) and assertions that Plaintiff's insistence on participation was sexually predatory and potential criminal conduct (see e.g. section E.g.3, E.g) due to their sex, gender, and presumed sexual orientation (see section E.h) constituted intentional discrimination by the institution (see section E.i) resulting in a violation Plaintiff's right to the equal benefits of counseling and adult support.

206. Defendant Valand coordinated with Defendant Bloom to ensure a unified and institutional discriminatory response. (see e.g. section E.g.3, E.i.5).

207. Additionally, by framing Plaintiff's participation in class as sexually predatory and inappropriate, every legitimate effort made by Plaintiff to engage with peers, including speaking in class, seeking inclusion in group activities, or asserting the right to fair treatment, was seen by Plaintiff as inappropriate and dangerous, warranting serious consequences and police involvement. See section e.g. E.j. This stigmatizing label further stripped Plaintiff of personhood within the school environment, rendering their attempts to participate unsafe and delegitimized. See e.g. section E.j.4 (internalization of shame for showing up to class), E.j.3 (Plaintiff left; bullying escalated). Such treatment denied Plaintiff's right to access education and

created and perpetuated a hostile environment on the basis of sex, gender, and perceived sexual orientation.

208.    Defendants' discriminatory assumptions about the nature of Plaintiff's situation led them to fail to respond to and actively as required under the district's anti-bullying policy and state law. See sections E.i (authority to respond to bullying), E.g.2 (support of bullying).

209.    This was an open, coordinated, and intentional institutional decision (see section E.i) to frame Plaintiff in a specific, discriminatory, and stigmatizing manner for wanting to participate equally in class with their peers, to silence their concerns, and to prevent Plaintiff from equally accessing counseling and education, led by Defendant Valand and supported by other counseling staff. See section E.g (Defendants' response), E.h (on the basis of sex), and E.i (institutional action).

210.    **Retaliation (*Jackson*, 544 U.S. 167).** Plaintiff's complaints about sex discrimination and denial of equal access to the class environment qualified as a protected activity. See ¶52 (discrimination complaints), see also section E.f (harassment), E.f.4 (on the basis of sex).

211.    Defendants' assertion that Plaintiff's insistence on participating with their peers in the classroom was criminal conduct warranting police involvement (see e.g. section E.g.3, E.g), immediately followed by an instruction to not discuss this and only this further, and coordination with other staff to and parents adopt their response (see e.g. section E.g.3), constituted an adverse action in retaliation for Plaintiff's complaints of discrimination. See E.g.6 for details on adverse action.

212.    Defendants' adverse action was in response to Plaintiff's complaints and was

intended by Defendants to prevent Plaintiff from continuing to raise complaints regarding the

discrimination. See ¶91 (warnings of criminal conduct and police involvement), ¶92

(immediately followed by instruction to stop raising this issue, and only this issue).

213.    Defendants' took adverse action in retaliation for Plaintiff's protected activity.

214.    These decisions constitute illegal discrimination by the institution stemming from

the counseling department's intentional discrimination and retaliation, resulting in denial of

benefits, a hostile environment, exclusion from participation, and subjection to discrimination in

violation of Title IX of the Education Amendments of 1972.

215.    **Deliberate Indifference to Student Discrimination (*Davis*, 526 U.S. 629).** In

the alternative, these decisions constitute illegal discrimination by the institution stemming from

deliberate indifference to known student harassment resulting in denial of benefits, exclusion

from participation, and subjection to discrimination in violation of Title IX of the Education

Amendments of 1972. Defendants were "appropriate persons," because they had authority to

address and take action to stop student bullying under institutional policy. See section E.i.

**CLAIM II**

**42 U.S.C. §1983: Violation of Fourteenth Amendment Equal Protection**

**(Against Thomas Valand and Daniel Bloom in their personal capacities)**

216.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully

set forth herein.

217.    Defendant Valand and Defendant Bloom were employees acting in their official

capacities as a social worker and school counselor at Steamboat Springs High School (SSHS), a

secondary school in SSSD. As a result, Defendant Valand and Defendant Bloom was acting

62

under color of state and local law.

218.    The Fourteenth amendment states: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

219.    Plaintiff was similarly situated to their other peers in class, as a student interested in participating in the shared environment.

220.    Defendants intentionally treated Plaintiff differently from their peers in class. In particular, Defendants protected Student A and B's right to participate in the space, choose who was allowed to inhabit the space (see E.h.7 for friend groups), and be comfortable, to the degree of supporting Plaintiff's removal from the class environment to achieve that end, (see e.g. E.g.4) while framing Plaintiff's insistence on participating, wish to engage with their peers, and be treated with respect as sexually predatory and criminal conduct. See e.g. E.g.2, E.g.3 (predatory framing and enforcement).

221.    As described in section E.h, the aforementioned conduct was discriminatory on the basis of sex, gender, presumed sexual orientation, and disability. Defendants', among other things, framed Plaintiff's wish to participate in class as pursuit of an inappropriate relationship that Plaintiff had explicitly disclaimed because of Plaintiff's sex, gender, presumed sexual orientation, and disability.

222.    On information and belief, Defendant Bloom's conduct was discriminatory on the basis of sex, gender, presumed sexual orientation, and disability. This is supported by their emphasis on "respecting [the student's] choices" in their interactions with Plaintiff, with

knowledge the students were harassing Plaintiff in attempts to remove them from the educational environment, adopting Defendant Valand's discriminatory narrative. Plaintiff had shared the situation with Defendant Bloom, and Bloom aligned with Valand's narrative throughout their interactions with Plaintiff. Additionally, Defendant Valand and Bloom worked together on this matter, and Bloom had awareness of the harassment in class and the harmful effects it was having on Plaintiff. See ¶157.

223.    Defendant Bloom, on the basis of Plaintiff's sex, gender, and disability, put Student B's comfort and wish to avoid accountability over Plaintiff's visible distress and right to participate in the classroom and school community. See ¶157.

224.    In the alternative, Defendants' treated Plaintiff differently in an intentional, wholly arbitrary, irrational and abusive manner.

225.    Defendants' discriminatory assumptions about the nature of Plaintiff's situation led them to fail to respond to bullying as required under the district's anti-bullying policy and state law. (see sections E.i (authority to respond to bullying), E.g.4 (support of bullying)).

226.    Defendant Valand's assertion that Plaintiff could not demand to be treated as if they existed in class directly communicated an intent to deny Plaintiff equal participation and access in class.

227.    Defendants' actions did not serve any important government objective, nor were they rationally related to any legitimate goal. See E.g.5.

228.    In the alternative, even if a legitimate objective existed, framing Plaintiff as a predator for merely insisting on participating in class is not substantially related to achieving any such objective.

229.    Defendant Valand and Bloom denied Plaintiff equal protection of the law.

## CLAIM III

**42 U.S.C. §1983: Violation of First Amendment Freedom of Speech and Right to Petition**

**(Against Thomas Valand and Daniel Bloom in their personal capacities)**

230.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

231.    Defendant Valand and Defendant Bloom were employees acting in their official capacities as a social worker and school counselor at Steamboat Springs High School (SSHS), a secondary school in SSSD. As a result, Defendant Valand and Defendant Bloom was acting under color of state and local law.

232.    The First amendment states: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

233.    Outside normal efforts to participate, and the interactions explicitly outlined in this complaint, Plaintiff did not raise this situation with the students involved.

234.    Defendants' assertions that Plaintiff's insistence on participating was criminal conduct ("stalking") and informing them they could get in trouble with the police for continuing to insist on participating followed shortly by a directive to stop raising this and **only this** issue functioned as a threat of punishment which successfully intimidated Plaintiff into stopping their speech. See E.g.6 for details.

235.    Defendants' implied threats of serious punishment, characterization of Plaintiff's

insistence on participating with their peers in the classroom as criminal conduct warranting police involvement (see e.g. section E.g.3, E.g), immediately followed by an instruction to not discuss this topic **and only this topic** further, and coordination with other staff to adopt their response towards Plaintiff's complaints (see e.g. section E.g.3), constituted an adverse action in retaliation for Plaintiff's speech. See E.g.6 for details on adverse action.

236.    Defendant Bloom violated Plaintiff's First Amendment rights, suppressing Plaintiff's protected speech and right to petition by making it clear Plaintiff had to stop pressing this issue. Defendant Bloom instructed Plaintiff not to discuss the situation further and emphasized "respecting their choices," reinforcing Defendant Valand's implied threats of criminal conduct and police involvement intended to stop Plaintiff from reporting and describing ongoing mistreatment. Defendant Bloom had knowledge the students were harassing Plaintiff in attempts to remove them from the educational environment. See ¶157. Defendant Bloom had worked with Defendant Valand regarding this situation, and supported their position. See e.g. ¶157. Defendant Bloom reinforced Defendant Valand's position, chilling Plaintiff's ability to speak out about their own distress.

**CLAIM IV**

**42 U.S.C. §1983: Violation of Fourteenth Amendment Substantive Due Process**

**(WITHDRAWN – Against Thomas Valand in their personal capacity)**

**CLAIM V**

**Municipal Liability under *Monell*: Custom, Policy, or Practice**

**(WITHDRAWN – Against Steamboat Springs RE-2 School District/SSSD)**

237.    Plaintiff alleges that the coordinated conduct of the staff over several months

potentially indicates a widespread custom or practice of the District. Plaintiff intends to seek leave to amend this complaint to include a formal Monell claim should discovery confirm the existence of such a widespread custom.

## CLAIM VI

### Municipal Liability under *Monell*: Ratification

### (WITHDRAWN – Against Steamboat Springs RE-2 School District/SSSD)

## CLAIM VII

### Failure to Train and Supervise

### (WITHDRAWN – Against Steamboat Springs RE-2 School District/SSSD)

## CLAIM VIII

### Violation of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act

### (Against Steamboat Springs RE-2 School District/SSSD)

238.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

239.    Section 504 of the Rehabilitation act applies to all programs that receive federal funding.

240.    Steamboat Springs School District (SSSD) is a public school district funded with $2,139,335 of federal funding in the 2022-2023 school year.

241.    Defendant Valand and Defendant Bloom were employees acting in their official capacities at Steamboat Springs High School (SSHS), a secondary school in SSSD.

242.    The counseling department was designated by the District to manage student behavioral reports and bullying concerns at SSHS. Defendants Valand and Bloom were

employed in and acted as SSHS's counseling department. See section E.i.

243. Plaintiff sought assistance from Defendants identifying the cause of their distress, and with their potential inability to get "social cues." Plaintiff wanted to know what they were supposedly doing wrong so that the other students would allow them to participate in class.

244. **Focus/Severe Distress/Severe Anxiety**: Plaintiff's disability was obvious and communicated. Plaintiff shared with Defendant Valand how their distress felt "terribly demotivating and gripping," "don't want to do anything," "all the time," "never goes away," and "terrible anxiety that prevents normal interaction," "lasting many hours at a time." See e.g. E.f.8 for more descriptions of Plaintiff's communicated disability, and their request for assistance to be able to participate in class. Defendant Valand acknowledged that Plaintiff was "absolutely" distressed, described how the situation occupied significant mental space, and noted that it interfered with Plaintiff's ability to focus on other things and "made things hard." These facts demonstrate that Plaintiff's condition substantially limited one or more major life activities, meeting the definition of "disability" under 42 U.S.C. § 12102 and 34 C.F.R. § 104.3(j). This pattern of distress was later diagnosed as PTSD, a widely recognized disability.

      a. Defendant Valand's characterizations ("chase," "stalking behavior," "infatuation") of Plaintiff's constant distress/anxiety/inability to concentrate or think recast Plaintiff's disability as sexually predatory, inappropriate, dangerous, and warranting segregation and removal.

      b. Defendants characterized Plaintiff's rumination (expression of their severe distress/anxiety) as sexually predatory, asserting that because Plaintiff had "ruminated" on the issue for a long time, Plaintiff "wanted to … I dunno,"

and that this kind of thing made "females, especially" feel worried and concerned. Defendant used this to justify framing Plaintiff's participation as inappropriate, dangerous, and warranting segregation and removal.

c.   Defendant Valand supported Plaintiff's removal and characterized Plaintiff's wish to engage with their peers as dangerous, inappropriate and sexually predatory because of their distress/disability. Additionally, Defendant Valand consciously disregarded the risk that Plaintiff would not be able to participate in class and the school environment because of their disability. See e.g. ¶107 for more deliberate disregard to access.

245.    **Communication Impairment:** Furthermore, Defendant Valand regarded Plaintiff as socially inept and/or unable to read social cues. See E.h.4, E.h.5. These facts demonstrate that Plaintiff's perceived condition limited one or more major life activities, as a perceived communication impairment. This meets the definition of "disability" under 42 U.S.C. § 12102 and 34 C.F.R. § 104.3(j).

a.   Defendant Valand listed concern that Plaintiff was "missing the social cue" that Student B "[did not] want this relationship to continue." The "relationship" Defendants referred to was Plaintiff's participation in classroom conversations. See ¶88.

b.   Defendant Valand's message that Plaintiff was "missing a social cue" that they were unwelcome in class leveraged Plaintiff's purported disability to support targeted bullying, exclusion, and/or discrimination as socially acceptable student conduct.

c.  By framing the other students' removal and Plaintiff's attempts to participate as a disability-related failure by Plaintiff to read cues, Defendants supported Plaintiff's removal from the classroom because of their perceived communication disability.

246.    On information and belief, Defendant Bloom was also aware of Plaintiff's actual and perceived disability, given Plaintiff interacted with Bloom several times, filled Bloom in on the situation, and Defendant Valand stated they likely had correspondence with Bloom on this situation. Bloom also had correspondence with Plaintiff's parents, demonstrating awareness of the situation.

247.    Defendants framed Plaintiff's wish to participate in class as sexually predatory and inappropriate. See section E.g. They used Plaintiff's disability as a basis. See e.g. E.h.3 (focus/distress/anxiety disability), E.h.5 (communication disability).

248.    Defendant Valand's support of the bullying (see e.g. section E.g.4), portrayal of their engagement in class as sexually predatory and criminal, and refusal to support Plaintiff (see e.g. section E.g) due to their disability (see sections E.h.3 (focus/distress/anxiety), E.h.5 (communication)) constituted a violation Plaintiff's right to the equal benefits of counseling and adult support. Defendant Bloom adopted the same discriminatory response. See E.i.5.

249.    Defendants' failed to respond to bullying as required under the district's anti-bullying policy and state law because of their discriminatory assumptions of Plaintiff's disability. (see sections E.i.2, E.g.2, on the basis of disability E.h.3, E.h.5).

250.    Defendant Valand's assertion that Plaintiff could not demand to be treated as if they existed in class directly communicated an intent to deny Plaintiff equal participation and

access in class. See section E.g.3. This action was taken because of Plaintiff's disability.

Defendant framed Plaintiff's standard attempts at self advocacy as inappropriate (intense

distress) and as the result of their disability ("missed social cues").

251.    By framing Plaintiff's participation in class as sexually predatory and

inappropriate, every legitimate effort made by Plaintiff to engage with peers, including speaking

in class, seeking inclusion in group activities, or asserting the right to fair treatment, was seen by

Plaintiff as inappropriate and dangerous, warranting serious consequences and police

involvement. See section E.j. This stigmatizing label effectively stripped Plaintiff of personhood

within the school environment, rendering their attempts to participate unsafe and delegitimized.

See e.g. section E.j.4 (internalization of shame for showing up to class), E.j.3 (Plaintiff left;

bullying escalated). Such treatment denied Plaintiff's right to access counseling and education

and created and perpetuated a hostile environment on the basis of disability.

252.    **Retaliation.** Plaintiff engaged in a protected activity. Plaintiff's attempts at

understanding the cause of and seeking assistance on how to address their distress, along with

their potential communication disability ("social cues"), so that they would be able to participate

in class constitutes a protected activity. See e.g. ¶30 (sought assistance with distress), ¶51

(sought assistance with potential communication disability be able to participate).

253.    Defendants' characterization of Plaintiff's distress and insistence on participating

with their peers in the classroom as criminal conduct warranting police involvement (see e.g.

section E.g.3, E.g), immediately followed by an instruction to not discuss this further, and

coordination with other staff and parents to adopt their response (see e.g. section E.g.3),

constituted an adverse action in retaliation for Plaintiff's complaints. See E.g.6 for details on

adverse action.

254.     Defendants' adverse action was in response to Plaintiff's complaints and was intended by Defendants to prevent Plaintiff from continuing to raise concerns regarding the situation. See ¶91 (assertion of criminal conduct), ¶92 (instruction to stop raising concerns in the same meeting, immediately after).

255.     Plaintiff merely requested the basic right to participate equally in class, yet even this was denied on basis of disability. The fact that even that was denied underscores how far the district fell below the bare minimum required under the law.

256.     **Failure to accommodate.** Defendants' were aware of Plaintiff's disability. See E.f.8. Plaintiff had explicitly requested assistance to be able to participate in class. See E.f.1 and E.f.8. Defendants' refusal to address the situation, retaliation, and discrimination constituted failure to accommodate. See E.g. Further, Plaintiff did not discover they were wrongfully injured until years later, instead believing their inability to focus or participate was the result of their own shortcoming of character or inappropriate need, and their fault and responsibility. See E.k.2.

257.     These decisions constitute discrimination, retaliation, and failure to accommodate by SSSD resulting in denial of benefits, a hostile environment, exclusion from participation, and subjection to discrimination in violation of 29 U.S.C § 794 and 42 U.S.C. § 12132.

## CLAIM IX

### Violation of CADA (C.R.S. § 24-34-601)

### (Against Steamboat Springs RE-2 School District/SSSD)

258.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

259.    Plaintiff incorporates by reference the allegations set forth in Claim I (Title IX) and VIII (ADA/§504) to the fullest extent applicable under Colorado law, as though fully set forth herein.

260.    As an educational institution, Steamboat Springs High School (SSHS) is a "place of public accommodation" under this statute.

261.    C.R.S. § 24-34-601 states: "It is a discriminatory practice and unlawful for a person, directly or indirectly, to refuse, withhold from, or deny to an individual or a group, because of disability, … sex, sexual orientation, gender identity, gender expression, … the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation …"

262.    Plaintiff exhibited and Defendant Valand (and potentially other staff/administrators) were aware of Plaintiff's disability as described in Claim VIII.

263.    Defendant Valand/Bloom were employees acting in their official capacities at Steamboat Springs High School (SSHS), a secondary school in SSSD.

264.    Defendant Valand/Bloom and other SSSD employees engaged in discriminatory and unlawful practices by refusing, withholding from, and denying:

      a.    Valand: The full and equal enjoyment of the classroom, creating a hostile environment by supporting bullying, asserting Plaintiff could not demand to be treated as if they exist in class, and warning of police involvement and serious consequences for pushing back (service/accommodation)

      b.    Valand/Bloom: The full and equal enjoyment of support in the classroom (privilege/advantage). Defendant Valand/Bloom put others' comfort over

Plaintiff's distress.

c.      Valand/Bloom: The full and equal enjoyment of counseling resources

(privileges/advantages)

on the basis of Plaintiff's disability, sex, sexual orientation, gender identity, and/or gender

expression.

Note: the exact categories assigned here are illustrative, and are in no way exhaustive.

265.    As employees working in their official job duties, SSSD (Defendant Valand's

employer and Defendant Bloom's former employer) is vicariously liable for Defendant Valand's

and coworkers' unlawful and discriminatory conduct.

## CLAIM X

### Extreme and Outrageous conduct

### (Against Thomas Valand in their personal capacity)

266.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully

set forth herein.

267.    Plaintiff alleges Defendant Valand engaged in conduct "so outrageous in

character, and so extreme in degree, that a reasonable member of the community would regard

the conduct as atrocious, going beyond all possible bounds of decency and utterly intolerable in a

civilized community"

268.    Defendant Valand took Plaintiff:

a.      with knowledge they were being mistreated, bullied, and systematically

removed from class participation. See section E.f.

b.      with knowledge they were turning inwards and trying to fix themselves

and understand. See e.g. ¶29 (came to Defendants to understand thee situation), ¶30 (wanted to resolve the situation, and cope with their distress), ¶51 (was attempting to placate the students so they were allowed to participate).

c.    with knowledge they were not romantically interested at all and wanted to be treated like their peers.

d.    with knowledge of their severe distress and how the situation was affecting their ability to participate in school. See E.f.8.

e.    and used their authority as a trusted adult and mental health professional to,

f.    frame it as a concern that Plaintiff missed the "social cue" that they were not welcome in the classroom (See e.g. ¶44), leveraging Plaintiff's attempt to understand and misleading Plaintiff further into low self esteem by supporting the bullying

g.    actively support the bullying. See e.g. E.g.4

h.    assert Plaintiff's participation in class was "stalking behavior" and warned of criminal consequences for not accepting the bullying, framing Plaintiff's wish to participate in class and not be bullied as sexually predatory and criminal. See e.g. E.g.2

i.    suppress Plaintiff's speech regarding the situation. See ¶92

j.    with no investigation or inquiry into the facts of the situation at hand.

k.    Frame Plaintiff's behavior as inappropriate to their parents and other staff,

75

further shaming and isolating them. See e.g. E.g.3 (coordination and enforcement), ¶94 (meeting with parents).

Plaintiff believes this conduct (including other conduct described in this complaint) meets the extreme and outrageous standard.

269.    Defendant Valand's conduct was willful and wanton. He stated the situation was "absolutely" distressing Plaintiff and even managed to describe how the situation specifically was harming Plaintiff's ability to focus and "made things hard." See e.g. section E.f.8 (effects of abuse and knowledge). He was aware the situation had previously caused suicidal thoughts. See ¶67. He was aware of many, many incidents and the distressing effects they had on Plaintiff. See section E.f (incidents and knowledge), E.f.8 (effects and knowledge). He knew that supporting the students' known distressing bullying, framing Plaintiff's wish to participate in class as criminal conduct, and refusing to support Plaintiff would cause Plaintiff severe emotional distress, yet continued despite this knowledge. See section E.g for staff action.

270.    Plaintiff did not discover they were wrongfully injured until February of 2025, due to Defendants' own actions. See e.g. E.k.2.

271.    As a direct result of Defendant Valand's actions, Plaintiff experienced suicidal ideation and engaged in reckless, life-endangering behavior, and endured severe emotional and mental distress and anguish for years on end. Plaintiff been since diagnosed with PTSD, and has been unable to engage with their peers or otherwise participate as described in section E.k.

## CLAIM XI

### Negligence

### (Against Thomas Valand in their personal capacity)

76

272. Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

273. Defendant Valand, as a social worker working at a public school in his official capacity, had a duty of care to Plaintiff to act reasonably and avoid causing harm.

274. Defendant Valand took Plaintiff:

    a.    with knowledge they were being mistreated, bullied, and removed from class participation. See section E.f.

    a.    with knowledge they were turning inwards and trying to fix themselves and understand. See e.g. ¶29 (came to Defendants to understand thee situation), ¶30 (wanted to resolve the situation, and cope with their distress), ¶51 (was attempting to placate the students so they were allowed to participate).

    b.    with knowledge they were not romantically interested at all and wanted to be treated like their peers.

    c.    with knowledge of their severe distress and how the situation was affecting their ability to participate in school. See E.f.8.

    d.    and used their authority as a trusted adult and mental health professional to,

    e.    frame it as a concern that Plaintiff missed the "social cue" that they were not welcome in the classroom (See e.g. ¶44), taking advantage of Plaintiff's attempt to understand and misleading Plaintiff further into low self esteem by insidiously supporting the bullying

f.    actively support the bullying See e.g. E.g.4

g.    assert Plaintiff's participation in class was "stalking behavior" and warned

of criminal consequences for not accepting the bullying, framing

Plaintiff's wish to participate in class and not be bullied as sexually

predatory and criminal. See e.g. E.g.2

h.    suppress Plaintiff's speech regarding the situation. See ¶92

i.    with no investigation or inquiry into the facts of the situation at hand.

j.    Frame Plaintiff's behavior as inappropriate to their parents and other staff,

further shaming and isolating them. See e.g. E.g.3 (coordination and

enforcement), ¶94 (meeting with parents).

Plaintiff believes this conduct (including other conduct described in this complaint) is far beyond

what any reasonable person or social worker would do under the circumstances.

275.    There is a national social worker code of ethics maintained by NASW. It can be

found at https://socialworkers.org/About/Ethics/Code-of-Ethics/Code-of-Ethics-English/Social-

Workers-Ethical-Responsibilities-to-Clients.

276.    By putting other students' wish to bully Plaintiff over Plaintiff's wish to

participate in class, Defendant Valand disregarded Plaintiff's right to choose who they want to be

(self-determination), breaching the professional standard of conduct (Ethics Code 1.02)

277.    By putting other students' wish to bully Plaintiff over Plaintiff's wish to

participate in class, Defendant Valand refused to take action against oppression, inequities, and

potential discrimination, breaching the professional standard of conduct (Ethics Code 1.05 (b))

278.    By claiming students did not have to treat Plaintiff fairly in class and informing

Plaintiff they could not demand better, Defendant Valand actively reinforced inequities, breaching the professional standard of conduct (Ethics Code 1.05 (b))

279.    Plaintiff has been injured because of Defendants' negligence. See E.j (short term injury), E.k (long term injury), E.g (action taken).

280.    Defendant Valand's conduct was willful and wanton. He stated the situation was "absolutely" distressing Plaintiff and even managed to describe how the situation specifically was harming Plaintiff's ability to focus and "made things hard." See e.g. section E.f.8. He was aware the situation had previously caused suicidal thoughts. See ¶67. He was aware of many, many incidents and the distressing effects they had on Plaintiff. See section E.f (incidents and knowledge), E.f.8 (effects and knowledge). He knew that supporting the students' known distressing bullying, framing Plaintiff's wish to participate in class as criminal conduct, and refusing to support Plaintiff would cause Plaintiff educational disruption, inability to participate in education, and severe mental distress, and risk of self harm, yet continued despite this knowledge. See section E.g for staff action.

281.    Plaintiff did not discover they were wrongfully injured until February of 2025, due to Defendants' own actions. See e.g. E.k.2.

282.    As a direct result of Defendant Valand's actions, Plaintiff experienced suicidal ideation and engaged in reckless, life-endangering behavior, and endured severe emotional and mental distress and anguish for years on end. Plaintiff been since diagnosed with PTSD, and has been unable to engage with their peers or otherwise participate as described in section E.k.

## CLAIM XII

### Negligence

79

**(WITHDRAWN – Against Daniel Bloom in their personal capacity)**

**CLAIM XIII**

**Failure to report child abuse (C.R.S. § 19-3-304)**

**(Against Thomas Valand in their personal capacity)**

283.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

284.    C.R.S. § 19-1-103 defines "abuse" and "child abuse or neglect" as "an act or omission in one of the following categories that threatens the health or welfare of a child: … (IV) Any case in which a child is subjected to emotional abuse. As used in this subsection (1)(a)(IV), "emotional abuse" means an identifiable and substantial impairment of the child's intellectual or psychological functioning or development or a substantial risk of impairment of the child's intellectual or psychological functioning or development."

285.    Colorado's Department of Human services is the agency responsible for maintaining the state's child abuse hotline, 844-CO-4-Kids. The agency has set up a website to provide awareness of Colorado's child welfare system, which can be found at co4kids.org

286.    Co4Kids's website provides a short (3) list of example concerning behaviors on their emotional abuse page. https://co4kids.org/child-abuse-neglect/types-of-abuse/emotional-abuse/

287.    An example provided by Co4Kids on their emotional abuse page is: "Isolation – Denying a child the ability to interact or to communicate with peers or adults outside or inside the home." This is directly analogous to the conduct of Student A in class calculated to isolate, erase, and prevent Plaintiff from participating in class with their peers. See E.f.

288.    Another example provided by Co4Kids on their emotional abuse page is:

"Inadequate nurturing or affection – The persistent, marked inattention to the child's needs for

affection, emotional support or attention." While Co4Kids is likely referring to emotional abuse

by a caregiver or parent, Student A's year-long, calculated, systematic, and deliberate refusal to

acknowledge Plaintiff's existence or right to participate in class while consistently performing

intimacy, affection, and care towards Student B in front of Plaintiff is a closely analogous

situation. While caregivers can deprive affection by withholding it, here, Student A weaponized

targeted attention, care, and affection to isolate, control, and humiliate Plaintiff and remove

Plaintiff from the class environment and normal peer participation. See E.f. Plaintiff was forced

to watch as they were removed from the class environment every day, in all but the most literal

sense. This resulted in inability to focus and participate in school, severe distress, and eventually

PTSD, clearly meeting the "emotional abuse" definition under C.R.S. § 19-1-103. See E.f.8

(resulting effects), E.j (effects after Defendants' support), and E.k (long-term harm and PTSD).

This was a known failure by SSSD to provide a safe classroom environment.

289.    The Colorado Division of Child Welfare's Mandatory Reporter training can be

found here: https://coloradocwts.com/wbt/mandatory_reporter_guest/story.html.

290.    The mandatory reporter training says emotional abuse "may include the

following: constant criticism, … rejection, … belittling."

291.    The systematic and deliberate emotional abuse Plaintiff endured in class qualifies

as "child abuse" under this statute. This treatment resulted in an identifiable, communicated, and

substantial impairment of Plaintiff's intellectual or psychological functioning and development,

manifesting through suicidal thoughts, distress, and PTSD. See E.f.8 (harm and knowledge), E.k

(long-term effects of the situation).

292.    Defendant Valand was aware of SSSD's failure to provide a safe classroom environment, and the resulting child abuse Plaintiff was enduring. See E.f. Defendant Valand has asserted that Plaintiff was "absolutely distressed" and knew the situation was causing severe anxiety and impairing Plaintiff's ability to think or engage in other tasks, and Valand had knowledge this had persisted for a significant period of time (at least months). See E.f.8 for staff knowledge. Additionally, Valand had access to a document indicating and Plaintiff recalls sharing in person that the treatment Plaintiff endured in class had caused Plaintiff suicidal thoughts, even though Plaintiff was not experiencing them at the time they shared. See ¶67.

293.    As a school employee and licensed social worker, Defendant Valand was required by law under C.R.S. § 19-3-304 to report known or suspected child abuse to the appropriate authorities.

294.    Defendant Valand knew about the abusive environment Plaintiff was enduring on a constant basis in class, knew the distressing, dangerous, and harmful effect it was having on Plaintiff, and instead of reporting it as required under state law, Defendant Valand reinforced the students' purported "right" to harm Plaintiff in class, framed Plaintiff's insistence on participating as criminal conduct, and warned of potential police involvement, all on the basis of Plaintiff's gender and disability. See sections E.g (Defendants' action), E.h (on the basis of sex/disability). This constituted a willful violation of their reporting obligations under state law.

295.    Under C.R.S. § 19-3-304(4), a willful violation of the mandatory reporting requirement is defined as a Class 2 misdemeanor and gives rise to civil liability for damages proximately caused. Plaintiff alleges that Defendant Valand willfully violated C.R.S. § 19-3-

304(1).

296.    Defendant Valand's conduct was willful and wanton. He stated the situation was "absolutely" distressing Plaintiff and even managed to describe how the situation specifically was harming Plaintiff's ability to focus and "made things hard." See e.g. section E.f.8 (effects of abuse and knowledge). He was aware the situation had previously caused suicidal thoughts. See ¶67. He was aware of many, many incidents and the distressing effects they had on Plaintiff. See section E.f (incidents and knowledge), E.f.8 (effects and knowledge). He knew that failing to report the child abuse, supporting the students' known distressing removal, framing Plaintiff's wish to participate in class as criminal conduct, and refusing to support Plaintiff would cause Plaintiff educational disruption, inability to participate in education, severe mental distress, and risk of self harm, yet continued despite this knowledge. See section E.g for staff action.

297.    Plaintiff did not discover they were wrongfully injured until February of 2025, due to Defendants' own actions. See e.g. E.k.2.

298.    As a result of Defendant Valand's failure to report child abuse, the bullying persisted and worsened, and Plaintiff engaged in a passive suicide attempt and endured severe emotional and mental distress and anguish for years on end. Plaintiff has been diagnosed with PTSD, and has been unable to engage with their peers or otherwise participate as described in section E.k.

**G.    REQUEST FOR RELIEF**

Plaintiff requests relief as follows:

1. Damages in an amount to be determined at trial including, without limitation, lost
   university costs, therapy costs, diminished academic performance, lost future earnings
   and opportunities, and ongoing pain and suffering, as well as punitive damages where
   appropriate, attorneys' fees, and any other relief the Court deems just and proper.

2. Declaratory relief and other appropriate equitable relief.

3. Injunctive relief where appropriate, including but not limited to requiring Defendant
   SSSD to adopt and implement new policies and training procedures to prevent future
   instances of retaliation, repeated humiliation/degrading behavior, bullying,
   discrimination, and staff misconduct related to student mistreatment. If a student reports
   mistreatment at school, there must be a strong and decisive response to investigate and
   protect the student, not support the bullying to make the student go away. SSSD should
   publish yearly summaries of its compliance efforts publicly on its website.

4. Award Plaintiff such other and further relief as the Court deems just, equitable and
   proper.

### H.    JURY DEMAND

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

### I.    PLAINTIFF'S SIGNATURE

I declare under penalty of perjury that I am the plaintiff in this action, that I have read this complaint, and that the information in this complaint is true and correct. *See* 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Under Federal Rule of Civil Procedure 11, by signing below, I also certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
(2) is supported by existing law or by a nonfrivolous argument for extending or modifying existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

/s/ Riley Doe
Riley Doe
rileydoevsssd@gmail.com
Pro Se Plaintiff
Plaintiff proceeding under pseudonym
Real name and address information filed under seal
_____
    (Plaintiff's signature)

4/1/2026
_____
    (Date)